Argued and submitted July 27, 1993, conviction for criminal mistreatment affirmed; remanded for entry of a corrected judgment merging convictions of murder by abuse and for resentencing; otherwise affirmed October 5, 1994, petition for review denied January 24, 1995 (320 Or 508)

# STATE OF OREGON,
*Respondent,*

*v.*

# RANDY DANIEL ZELINKA,
*Appellant.*

## (90P-3292; CA A72874)

882 P2d 624

Peter Gartlan, Deputy Public Defender, argued the cause and filed the brief for appellant.

Janie M. Burcart, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, Virginia L. Linder, Solicitor General, and Kaye M. Sunderland, Assistant Attorney General.

Before Deits, Presiding Judge, and Richardson, Chief Judge, and Haselton,* Judge.

HASELTON, J.

---

* Haselton, J., *vice* Durham, J.

## HASELTON, J.

Defendant appeals his conviction, following a jury trial, for three counts of murder by abuse, ORS 163.115-(1)(c),[1] and criminal mistreatment. ORS 163.205(1)(a).[2] Defendant was sentenced to life imprisonment with a mandatory minimum term of 25 years. We affirm the convictions and remand for merger of the murder by abuse convictions and for resentencing.

We view the evidence in the light most favorable to the state. *State v. Tucker*, 315 Or 321, 325, 845 P2d 904 (1993). Defendant and his domestic partner, Karen Tracy, had four children. The victim, Michelle, was 23 months old at the time of her death. Her siblings, Corrine, Samuel and Angela, were six years, five years and six months old, respectively.

Upon returning home from work on September 18, 1990, defendant saw Michelle on a table where she was not allowed to be. Defendant jerked her off the table and onto the floor, with Michelle possibly hitting the arm of a chair as she fell. Samuel testified that defendant stomped on Michelle, while she was on the floor. Defendant then kicked her and used his foot to lift her into a chair. Defendant also slapped Michelle. She suffered a rupture of her small intestine, an injury caused by trauma. She died the next day of peritonitis, an infection of the abdominal cavity caused by seepage of fecal matter from the small intestine.

An external examination of Michelle revealed bruises on her head, arm and back. An autopsy revealed more

---

[1] ORS 163.115(1)(c) (*since amended by* Or Laws 1993, ch 664, § 10), provided:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"(c) By abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age * * * and the person has previously engaged in a pattern or practice of assault or torture of the victim or another child under 14 years of age * * *."

[2] ORS 163.205(1)(a)(*since amended by* Or Laws 1993, ch 364, § 2), provided:

"A person commits the crime of criminal mistreatment in the first degree if:

"(a) The person, in violation of a legal duty to provide care for another person * * * intentionally or knowingly withholds necessary and adequate food, physical care or medical attention from that other person[.]"

bruises and seven rib fractures in various stages of healing, including rib fractures near her spine, which suggested "violent compression" of the torso.

On the day of Michelle's death, defendant and Tracy were interviewed by Detective Stoelk at the police station, and the remaining children were taken into custody by Children's Services Division (CSD). Two days after Michelle's death, Stoelk contacted defendant and Tracy at a motel across from the police station, where they were staying, and Tracy accompanied him to the station for further questioning. Stoelk asked both defendant and Tracy to come to the station the next morning for further questioning.

The following morning Stoelk questioned Tracy and defendant separately at the station. During the course of a polygraph exam, Tracy said that defendant told her that he had kicked Michelle the night before she died. While alone with defendant, Stoelk told him the cause of Michelle's death and asked if she had suffered any injuries, specifically whether Michelle had been kicked. Defendant shook his head indicating "no" to questions about injuries and orally responded "no, no, she wasn't kicked." Defendant initially agreed to take a polygraph exam as well, but, after being read a consent form containing *Miranda*-like[3] warnings, defendant declined to take the exam without first consulting an attorney.

At that point, defendant left the police station. Approximately two hours later, Stoelk spoke with defendant at his motel room, and defendant admitted, "I did it, I kicked her." Stoelk told defendant that they needed to continue

---

[3] *See Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966). Before administering the polygraph, the officer read defendant a consent form, which provided:

"I have been told by Tom Mason that he was a police officer and I am being interviewed regarding Michelle's death. It has been explained to me that I have a right to remain silent. I realize anything I say at any time during the interview can be used against me in a court of law or other proceedings. I understand I have a right to talk to a lawyer prior to this interview and have a lawyer present while I'm being questioned. I also understand that if I cannot afford a lawyer one will be appointed to represent me at public expense. I have been advised I have the right to stop this interview at any time. The nature of this interview has been explained to me and I understand that I cannot be required to submit to this interview without my consent. In understanding my rights as stated above, I do voluntarily without threat or promise wish to talk to the interviewer."

talking about the death at the police station. Defendant accompanied Stoelk to the station and gave two taped statements. Before the first, Stoelk reminded defendant that he had been read *Miranda* warnings earlier that day. Defendant said that he remembered. Before the second statement, defendant was specifically given *Miranda* warnings. In the statements, defendant admitted yanking Michelle off the table and then lifting her off the floor using his foot.

Defendant was indicted on four counts of aggravated murder by abuse[4] and two counts of criminal mistreatment in the first degree. He was convicted of murder by abuse, manslaughter and criminal mistreatment. Defendant demurred to the indictment on several grounds and assigns error to the trial court's disallowance of the demurrer.

■ Defendant first argues that *aggravated* murder by abuse is not a crime and that the indictment is, therefore, "void *ab initio*," invalidating his convictions for the lesser included offenses of murder by abuse and manslaughter. However, we do not decide whether aggravated murder by abuse is a crime.

"[W]here a defect related to an allegation [in an indictment] does not affect the validity of the conviction on any properly alleged underlying offense, the appropriate remedy is to affirm the conviction on the underlying offense and remand for resentencing." *State v. Ferrell*, 315 Or 213, 224, 843 P2d 939 (1992).

There is no dispute that defendant's indictment properly alleged the lesser included offenses of murder by abuse and manslaughter. Any defect in charging aggravated murder by abuse did not affect the validity of defendant's convictions on those underlying offenses. *See State v. Ferrell, supra.*

■ Defendant next argues that the murder by abuse statute is unconstitutionally vague under Article I, sections

---

[4] The aggravating factor alleged by the state is provided in ORS 163.095(1):

"As used in ORS 163.105 and this section, 'aggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(e) The homicide occurred in the course of or as a result of intentional maiming or torture of the victim."

20 and 21, of the Oregon Constitution, and under the Fourteenth Amendment to the United States Constitution. Because the statute does not implicate First Amendment rights, the appropriate inquiry is "whether the statute is constitutional as applied to defendant under these circumstances." *State v. Butterfield*, 128 Or App 1, 8, 874 P2d 1339, *rev den* 319 Or 625 (1994). As in *Butterfield*, defendant makes no argument that the statute is vague as applied to him. Accordingly, we do not consider his challenge.

■　　　Defendant also argues that ORS 163.115(1)(c) is unconstitutionally overbroad because it, hypothetically, encompasses fact situations beyond those intended by the legislature.[5] That is not an "overbreadth" challenge.

> "A claim of 'overbreadth' cannot properly assert that the words of the law, read literally, are broader than the lawmaker intended, for that is an issue to be resolved by interpretation." *State v. Robertson*, 293 Or 402, 410, 649 P2d 569 (1982).

Defendant's final challenge to the indictment is that it fails to specify the prior incidents of assault or torture constituting the requisite "pattern or practice."[6] An indictment must contain:

> "[a] statement of the acts constituting the offense in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended[.]" ORS 132.550(7).

The functions of an indictment are:

> "(1) to inform the defendant of the nature of the crime with sufficient particularity to enable him to make his defense, (2) to identify the offense so as to enable the defendant to avail himself of his conviction or acquittal thereof if he should be prosecuted further for the same cause, and (3) to

---

[5] Defendant does not claim that his conduct is beyond the scope of conduct that the legislature intended to criminalize.

[6] The state argues that defendant did not preserve this argument. However, defendant adequately raised the issue to the trial court in his demurrer:

"[T]he following language is so vague and uncertain as to fail to inform defendant of what conduct he is accused of, and must defend against:

" '... said defendant *having previously engaged in a pattern or practice of assault or torture* of ... a child under 14 years of age * * *.' " (Emphasis in original.)

inform the court of the facts charged so that it may determine whether or not they are sufficient to support a conviction." *State v. Montez*, 309 Or 564, 597, 789 P2d 1352 (1990).

Generally, an indictment in the language of the relevant statute is sufficiently definite and certain. *State v. Montez, supra,* 309 Or at 597.

Defendant, however, argues that under *State v. Kincaid*, 78 Or App 23, 714 P2d 624 (1986), an indictment charging an individual with a crime requiring proof of predicate offenses must allege those predicate offenses with particularity. Defendant's reliance on *Kincaid* is misplaced. In that case, the defendant was charged with unlawful racketeering activity in violation of the Oregon Racketeer Influenced and Corrupt Organization Act (ORICO). To prove the crime charged in the indictment, the state was required to prove two predicate offenses. The predicate offenses alleged in the indictment were "thefts in the first degree." The defendant argued that the indictment failed because, without information as to which incidents of theft the state intended to prove, he could not prepare a defense. We agreed with the defendant in that case for two reasons, neither of which is present here. First, the ORICO statutory language was insufficient to apprise the defendant of the particular circumstances that made his conduct criminal. Second, the availability of discovery in that case, because of its large volume, was unlikely to inform the defendant of the specific criminal conduct the state intended to prove.

■ In this case, the indictment sufficiently apprised defendant of the particular circumstances that made his conduct criminal. Unlike *Kincaid*, the indictment alleged that defendant "previously engaged in a pattern or practice of assault or torture" on his *individually named children.*[7]

---

[7] Count I of the indictment alleged, in part, that:

"Said defendant, on or about September 19, 1990 * * * did unlawfully, feloniously and recklessly under circumstances manifesting extreme indifference to the value of human life, cause the death of Michelle Ann Zelinka, a child under 14 years of age, by subjecting said child to blunt trauma to the abdomen causing a rupture of the small intestine, and by failing to obtain medical treatment for said condition, said acts occurring in the course of the intentional torture of said victim, and said defendant having previously engaged in a pattern or practice of assault or torture of Michelle Ann Zelinka * * *."

Counts II, III, and IV of the indictment similarly alleged murder by abuse, with the

Moreover, it would be unworkable to require the state to particularize incidents of assault. The young ages of the victims (and Michelle's death) made it impossible for the state to identify the times more precisely, and the date of the past incidents is not a material element of the offense. *See State v. Wood*, 112 Or App 61, 69, 827 P2d 924, *rev den* 313 Or 355 (1992). Finally, in this case, the discovery provided to defendant[8] was likely to adequately inform him of the instances of assault on which the state would rely. The court did not err in disallowing defendant's demurrer to the indictment.

Defendant's second assignment of error is that the trial court improperly permitted the state to use acts committed before the enactment of ORS 163.115(1)(c) to prove defendant's "pattern or practice of assault or torture." Defendant contends that this violates the *ex post facto* clauses of the Oregon and United States Constitutions. Or Const, Art I, § 21; US Const, Art I, § 9.[9] The *ex post facto* provisions of both the United States Constitution and the Oregon Constitution are applied similarly. *State v. Burke*, 109 Or App 7, 11 n 3, 818 P2d 511 (1991), *rev den* 312 Or 589 (1992); *Howard v. State Board of Parole*, 105 Or App 288, 292, 804 P2d 509 (1991), *rev den* 311 Or 432.

The United States Supreme Court described *ex post facto* laws in *Calder v. Bull*, 3 US (3 Dall) 386, 1 L Ed 648 (1798):

"1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates a crime,*

---

"pattern or practice of assault or torture" having occurred on defendant's other three children.

[8] Defendant requested and received "all Children's Services Division's records and notes pertaining to or derived from interviews with the minor children of the defendant, specifically [Samuel and Corrine]." Defendant also received the district attorney's notes of interviews with the children.

[9] As support for his position, defendant points to the ORICO statute, ORS 166.715(4), which requires that "at least one of such incidents [of racketeering activity] occurred after [the Act's effective date]." The relevance of the ORICO provision, even by way of analogy, is unclear. The fact that the legislature may, out of an abundance of caution, have acted to forestall *ex post facto* challenges to one statute has little, if anything, to do with the operation of another, entirely unrelated statute. In any event, in this case, one illegal act—Michelle's death—did occur after the effective date of the statute.

or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment*, and inflicts a *greater punishment* than the law annexed to the crime, when committed. 4th. Every law that alters the legal rules of evidence, and receives less, or different, testimony, than the law required at the time of the commission of the offense, *in order to convict the offender*." (Emphasis in original.)

The purpose of *ex post facto* provisions is "to prevent vindictive and arbitrary criminal legislation and to provide fair notice of those acts which will subject an individual to criminal sanctions." *State v. Burke, supra*, 109 Or App at 13.

■      Defendant's *ex post facto* argument turns on an artificial disassociation of the pre-enactment assaults from the post-enactment murder. Murder by abuse requires *both* elements. Accordingly, defendant's crime was not completed until after the enactment of the statute.[10] *See State v. Lamb*, 110 Or App 146, 822 P2d 143 (1991) (*ex post facto* provisions are not violated in a prosecution for felon in possession of a firearm even if defendant's felony was committed before enactment of the statute).

In his third assignment of error, defendant argues that the trial court should have suppressed statements made in violation of defendant's right against self-incrimination under Article I, section 12, of the Oregon Constitution and the Fifth Amendment to the United States Constitution.

The material circumstances of defendant's statements were as follows: When defendant was initially questioned at the police station, he specifically denied kicking Michelle. Defendant initially agreed to take a polygraph exam but, after being informed of his *Miranda*-like rights, he refused to take the exam without advice of counsel. Defendant then returned to his motel, which was associated with the restaurant for which defendant worked and was located across the street from the police station. Approximately two hours later, Stoelk knocked on the open door of defendant's motel room and asked if he could come in to talk. Defendant invited him in. After Stoelk confronted defendant with what

---

[10] The murder by abuse statute does not increase the penalty for, nor "aggravate," the earlier assaults.

the police knew about Michelle's death, defendant admitted, "I did it; I kicked her."

Stoelk then told defendant that they needed to continue the conversation at the police station. Defendant was never formally arrested, was not handcuffed, and rode to the station in the front of the police car. At the station, defendant made two taped statements. Before the first statement, Stoelk asked defendant if he remembered the *Miranda*-like warnings he had received approximately two hours earlier, defendant said he did, and Stoelk did not repeat those warnings. Before the second taped statement, *Miranda* warnings were fully given.

Defendant argues that his statement in the motel and his first taped statement at the police station should have been suppressed because he was not given *Miranda* warnings. He further argues that his second taped statement should have been suppressed as derivative of his previous statements. We examine this issue separately under the Oregon and federal constitutions. *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990).

■ Under the Oregon Constitution, *Miranda*-like warnings are required when the defendant is in "full custody" and "may be required in circumstances that, although they do not rise to the level of full custody, create a 'setting which judges would and officers should recognize to be "compelling." ' " *State v. Smith, supra*, 310 Or at 7; *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987). Defendant does not argue that he was in "full custody" when he made either statement.[11]

He argues, however, that the questioning in the motel room took place under compelling circumstances because he had been

"questioned three separate times over 4 days. His children were taken into CSD custody; he was separated from his spouse; his house was searched; an autopsy was performed

---

[11] In *State v. Magee, supra*, 304 Or at 265, the Supreme Court declined to specifically define "full custody" but explained:

"The concept obviously includes extended official detention in a cell or another enclosure, with or without booking or deprivation of personal belongings. But an enclosure is not essential; one would hardly dispute that a person handcuffed on the street or in his own home is in 'full custody.' "

on his child; he was told as a result of the autopsy on the child and the polygraph interview with Tracy, police knew how the child died; prior to the interview in the motel room, the lead detective told him that he 'really wanted to talk about this'; and, finally, defendant admitted to kicking the victim, exactly the question the detective had asked him earlier and which defendant had vehemently denied."

Defendant argues that those circumstances led him to believe that he was the principal suspect in Michelle's death, and that Stoelk's interviewing style was "designed to elicit admissions and confessions."

Those facts alone do not create "compelling circumstances."

"[T]he fact that police question a person as a suspect in a crime 'does not inherently create a "compelling" setting for Oregon constitutional purposes.' " *State v. Carlson*, 311 Or 201, 205, 808 P2d 1002 (1991) (quoting *State v. Smith, supra*, 310 Or at 11).

In *Smith*, the defendant, who was temporarily living at an alcohol treatment facility as a condition of probation, was questioned several times about the death of his wife. By the final interview, the defendant was the "primary suspect" in his wife's murder. The court held that the circumstances of the questioning were not compelling because the defendant was questioned in "surroundings relatively familiar" to him and the defendant "of his own free will, agreed to meet the detective." 310 Or at 7. The court further held that the fact the defendant was the primary suspect was "legally insignificant."

■ Similarly, here, the questioning that occurred in the motel was in a familiar setting, associated with defendant's long-term place of employment, and defendant invited the officers into the room. The trial court found that "defendant was free to leave." There is evidence to support this finding, so we are bound by it. *State v. Jacobus*, 318 Or 234, 240, 864 P2d 861 (1993). The record demonstrates that the officers "in no way coerced, compelled, or pressured defendant to answer." *State v. Smith, supra*, 310 Or at 8. Defendant was not questioned under "compelling" circumstances at the motel.

■    Under the United States Constitution, *Miranda* warnings must be given

> "when a person is 'in custody,' *i.e.*, when a person's freedom has been 'significantly restrained.' * * * Conversely, *Miranda* warnings are not required when the person is not in custody, even if—for example—the questioning occurs in a police station." *Oregon v. Mathiason*, 429 US 492, 97 S Ct 711, 50 L Ed 2d 714 (1977).

The federal test for determining whether a person is in custody is

> "whether 'a reasonable person in defendant's situation would have understood himself [under the totality of the circumstances] to be in custody or under restraints comparable to those associated with a formal arrest.' " *State v. Brown*, 100 Or App 204, 211, 785 P2d 790, *rev den* 309 Or 698 (1990) (quoting *Berkemer v. McCarty*, 468 US 420, 441-42, 104 S Ct 3138, 82 L Ed 2d 317 (1984)).

Defendant was not in "custody" at the motel under the federal standard.

■    Defendant contends that the circumstances at the station were more compelling. We agree. At that point, defendant had confessed to kicking his daughter and was escorted to the police station, albeit not in handcuffs. Although defendant was not actually placed under arrest, the officers should have recognized the circumstances at that point as "compelling." *See State v. Magee, supra*, 304 Or at 266; *State v. Rose*, 109 Or App 378, 819 P2d 757 (1991) (the defendant was questioned in a "compelling setting" when she was ordered to climb out of her car and stand near the officer after she admitted that there was a weapon in the car).

However, defendant was adequately warned of his rights and knowingly and voluntarily waived those rights. Before the polygraph examination, defendant was read a consent form that contained *Miranda* warnings. The warnings were not limited to the context of a polygraph. Two hours later, before the first taped interview at the police station, the officer reminded defendant that he had already been advised of his rights. Defendant responded that he remembered. Under the circumstances, the warning was sufficient.

Because we hold that defendant's first two statements are admissible, we have no occasion to address his argument that the final statement at the police station was tainted by the earlier illegalities.

█ Finally, defendant argues that all of his statements must be suppressed because police violated his state and federal constitutional rights by questioning him after he had invoked his right to counsel. Questioning must cease when a suspect in custody "unequivocally requests to talk to a lawyer." *State v. Kell*, 303 Or 89, 95, 734 P2d 334 (1987). However, a defendant may make a limited invocation of counsel. 303 Or at 100; *State v. Gable*, 127 Or App 320, 332, 873 P2d 351, *rev den* 319 Or 274 (1994). The trial court found that "[d]efendant's request for counsel was limited to inquiry regarding the polygraph equipment and test procedure." There is evidence to support that finding. Before the polygraph examination, defendant told the examiner that he had been told "not to do anything with police machines without first talking to an attorney" and that "he did not want to take a polygraph examination without first talking to an attorney."[12] Because defendant's request for counsel was so limited, the continued questioning was constitutionally permissible and did not warrant suppression.

█ Defendant's fourth assignment of error is that the trial court erred in admitting evidence that defendant abused Tracy. He argues that the evidence was irrelevant and that any probative value was outweighed by the prejudice caused by the evidence. We need not decide whether the trial court committed error because, in any event, the evidence was harmless. Evidentiary error requires reversal only if it affected a "substantial right" of the defendant, which has been interpreted to mean more than a "little likelihood" that the error affected the verdict. *State v. Isom*, 306 Or 587, 761 P2d 524 (1988). Defendant admitted that he kicked Michelle. The evidence showed that Michelle had suffered serious injuries, including seven broken ribs, over an extended period

---

[12] Defendant urges us to reconsider our holding in *State v. Sadler*, 85 Or App 134, 139, 735 P2d 126, *mod* 86 Or App 152, 738 P2d 601 (1987), that the rule against police-initiated questioning following an invocation of counsel does not apply to noncustodial questioning. Because we hold that defendant did not "unequivocally" invoke his right to counsel, *Sadler* is inapposite.

of time. Samuel testified that defendant frequently punched him and would step on Michelle. Corrine testified that defendant slapped his children "real hard" and piled blankets on six-month-old Angela's head to "keep her quiet." Under these circumstances, there is little likelihood that the jury's verdict was affected by evidence that defendant also abused Tracy.

■    Defendant's fifth assignment of error is to the jury instruction defining "assault":

> "Assault means to intentionally, knowingly or recklessly cause physical injury to another person. In that regard, intentionally and recklessly have the same meaning."

Defendant argues that the instruction improperly allowed the jury to consider prior unintentional acts. However, defendant did not except to the instruction on those grounds.[13] Consequently, defendant's argument was not preserved for review. *See Wulff v. Sprouse-Reitz Co., Inc.*, 262 Or 293, 298-300, 498 P2d 766 (1972); *Menke v. Bruce*, 88 Or App 107, 112-13, 744 P2d 291 (1987).

In his sixth assignment of error, defendant asserts that the court erred in giving a "witness false in part" jury instruction.[14] Defendant argues that the instruction was an

---

[13] During a work session on proposed instructions, defense counsel complained, generally, that he was not satisfied with the assault instruction.

"[Defense counsel]: I don't think I know what the Legislature meant, the way they used it in this particular statute. I don't know if they meant the pattern of assault is found in the criminal code or not. I don't have a definite definition. I don't have an alternative definition.

"* * * * *

"Well, I guess I just want the record to be clear, it's our position we don't have any choice.

"[Court]: All right. *This is kind of a work session and nothing you say here means that you can't take exceptions when we get to it.*" (Emphasis supplied.)

Defendant never excepted to the instruction.

[14] The challenged instruction read:

"A witness who lies under oath in some part of his or her testimony is likely to lie in other parts of his or her testimony. Therefore, if you find that a witness has lied in some part of his or her testimony, then you may distrust the rest of that witness' testimony.

"Sometimes, however, witnesses who are not lying may give incorrect testimony. They may forget matters or they may contradict themselves. Also different witnesses may observe or remember an event differently.

improper comment on the evidence and created a presumption that the witness' testimony is not credible. We rejected an identical argument in *State v. Long*, 106 Or App 389, 394, 807 P2d 815, *on recon* 107 Or App 284, 812 P2d 831 (1991), *overruled on other grounds* 111 Or App 233, 826 P2d 37, *rev'd* 316 Or 143, 850 P2d 1093 (1992), and decline defendant's request to reconsider that holding.

Defendant's seventh assignment of error is that the court should have merged his three murder by abuse convictions into one conviction. The state concedes that the convictions should merge because there was only one murder victim and only one statute that defendant violated. We accept the concession.

■ In his final assignment of error, defendant challenges the court's failure to sentence him under the sentencing guidelines. The court imposed a life sentence with a minimum term of 25 years imprisonment, *i.e*, a 10-year mandatory minimum and an additional 15-year discretionary minimum, pursuant to ORS 163.115(3)(b) and (c). Under *State v. Morgan*, 316 Or 553, 558, 856 P2d 612 (1993), the 25-year minimum sentence is valid,[15] but the life sentence must be converted into a life term of post-prison supervision. We remand for resentencing consistent with *State v. Morgan, supra*.[16] *See State v. Hostetter*, 125 Or App 491, 493, 865 P2d 485 (1993), *rev den* 318 Or 583 (1994).

---

"You folks and you alone have the sole responsibility to determine what testimony or portions of testimony you will or will not rely upon in reaching your verdict."

[15] ORS 137.637 provides:

"When a determinate sentence of imprisonment is required or authorized by statute, the sentence imposed shall be the determinate sentence or the presumptive sentence as provided by the rules of the State Sentencing Guidelines Board, whichever is longer."

[16] The court found that there were aggravating factors but explained that

"[t]he sentence that I would have imposed would have been the same sentence based on each of these aggravating factors that I have found * * *[.] [T]he Court's sentence would have been the same, and that is a determinate sentence of 25 years imprisonment, the same minimum sentence that I imposed under the other scheme of sentencing."

Although *Morgan* left open the possibility that a life sentence might be an appropriate departure sentence under the guidelines, the court here did not impose a departure sentence of life imprisonment under the guidelines.

Conviction for criminal mistreatment affirmed; remanded for entry of a corrected judgment merging convictions of the murder by abuse and for resentencing; otherwise affirmed.