Argued and submitted April 28, 1994; resubmitted In Banc November 9, 1994,
reversed and remanded for new trial January 25, petition for review denied
May 16, 1995 (321 Or 138)

# STATE OF OREGON,
*Respondent,*

## v.

# RAYMOND GILBERT POLLARD,
*Appellant.*

## (C920219CR; CA A77376)

888 P2d 1054

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the brief was Sally L. Avera, Public Defender.

Janie M. Burcart, Assistant Attorney General, argued the cause for respondent. With her on the brief were Theodore R. Kulongoski, Attorney General, and Virginia L. Linder, Solicitor General.

HASELTON, J.

Riggs, J., concurring in part; dissenting in part.

## HASELTON, J.

Defendant appeals his conviction for murder by abuse. ORS 163.115(1)(c). He argues that the trial court erred in denying his demurrer to the indictment and in denying his motion to suppress inculpatory statements he made during a police interview. Because defendant's statements were improperly induced by implied promises of leniency, we conclude that those statements should have been suppressed. We reverse and remand for a new trial.

On June 19, 1991, defendant was taking care of his six-month-old baby, Joshua, when the baby stopped breathing. After Joshua was rushed to the hospital, an examination revealed that he had two subdural hematomas[1] that were two to three weeks old, an acute subdural hematoma that was a few hours to five days old, and retinal hemorrhages. X-rays indicated that the baby also had a broken leg and a broken arm, each at different stages of healing. Joshua's examining and treating doctors concluded that he suffered from "shaken baby syndrome."[2]

Joshua was hospitalized until July 15, 1991, and then released to a foster home. Because of the brain damage, Joshua's brain atrophied to half of its normal size, which, in turn, weakened his reflex systems. The baby showed little improvement and, despite medication, suffered from recurring seizures. On February 9, 1992, Joshua died. An autopsy revealed that he died of head injuries, terminal seizures, and aspiration of stomach contents. Joshua's death was a direct result of the injuries that had occurred on or before June 19, 1991. After Joshua's death, defendant was convicted of murder by abuse. ORS 163.115(1)(c).

■■ Defendant assigns error to the trial court's denial of his demurrer to the indictment for murder by abuse, arguing that the indictment was deficient in three respects. First, defendant argues that the terms "assault" and "pattern or

---

[1] A subdural hematoma is an accumulation of blood beneath the dura membrane that surrounds the brain. It is caused by the tearing of the blood vessels between the brain and the dura.

[2] Shaken baby syndrome occurs when an infant is shaken very vigorously, causing the brain to move back and forth, tearing blood vessels and potentially causing other brain damage.

practice" used in ORS 163.115(1)(c)[3] render the statute unconstitutionally vague under both Article I, sections 20 and 21, of the Oregon Constitution, and the Fourteenth Amendment to the United States Constitution. In considering a vagueness challenge to a statute that does not implicate free expression, we consider only whether "application of the contested statute to the *defendant's* conduct violates the 'void for vagueness' doctrine." *State v. Butterfield*, 128 Or App 1, 7, 874 P2d 1339, *rev den* 319 Or 625 (1994). (Emphasis supplied.) Here, defendant does not assert that he was unable to determine that *his* conduct was prohibited by ORS 163.115(1)(c). *See State v. Butterfield, supra*, 128 Or App at 8. Rather, he presents an abstract challenge based on factual contexts other than his own. That is insufficient to support a vagueness challenge. *State v. Zelinka*, 130 Or App 464, 469, 882 P2d 624 (1994).

■      Defendant next contends that the murder by abuse statute is unconstitutionally overbroad in that, as written, the statute "encompasses potential defendants who were not intended to be within the reach of the statute." A statute is overbroad

> "to the extent that it announces a prohibition that reaches conduct which may not be prohibited. A legislature may make a law as 'broad' and inclusive as it chooses unless it reaches into constitutionally protected ground." *State v. Blocker*, 291 Or 255, 261, 630 P2d 824 (1981).

Defendant does not argue that ORS 163.115(1)(c) is overbroad as applied to him; therefore, to successfully assert a facial overbreadth challenge, he must demonstrate that the murder by abuse statute infringes on constitutionally protected conduct. *State v. Albee*, 118 Or App 212, 217, 847 P2d 858, *rev den* 316 Or 528 (1993). Because defendant does not do so, his overbreadth claim fails.

---

[3] ORS 163.115(1)(c) (*since amended by* Or Laws 1993, ch 664, § 1) provided:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"'* * * * *

"(c) By abuse when a person, recklessly under circumstances manifesting extreme indifference to the value of human life, causes the death of a child under 14 years of age * * * and the person has previously engaged in a pattern or practice of assault or torture of the victim or another child under 14 years of age * * *.''

■ ■    Finally, defendant argues that the indictment violates ORS 132.550(7), because it fails to allege the specific incidents of abuse that the state intended to prove to show that he engaged in a "pattern or practice of assault or torture."[4] ORS 132.550(7) requires that an indictment set forth "a statement of the acts constituting the offense * * * in such manner as to enable a person of common understanding to know what is intended[.]" The functions of an indictment are:

> " '(1) to inform the defendant of the nature of the crime with sufficient particularity to enable him to make his defense, (2) to identify the offense so as to enable the defendant to avail himself of his conviction or acquittal thereof if he should be prosecuted further for the same cause, and (3) to inform the court of the facts charged so that it may determine whether or not they are sufficient to support a conviction.' " *State v. Montez*, 309 Or 564, 596-97, 789 P2d 1352 (1990) (quoting *State v. Cohen*, 289 Or 525, 529, 614 P2d 1156 (1980)).

An indictment that tracks the statutory language of the crime charged is generally considered sufficient to fulfill those functions. *State v. Montez, supra*, 309 Or at 597. Greater specificity may be required if the statutory language is not sufficiently clear to apprise defendants of the particular circumstances that make their conduct criminal and if discovery is not likely to cure the defect. *State v. Kincaid*, 78 Or App 23, 29-30, 714 P2d 624 (1986). Here, unlike in *Kincaid*, the statutory language, coupled with identification of the victim and his injuries, sufficiently notified defendant of the conduct the state intended to prove. Moreover, requiring the indictment to allege the specific dates that the incidents of assault and torture occurred would be unworkable, because the victim's young age made it impossible to identify those dates. *See State v. Zelinka, supra*, 130 Or App at 471. Thus, the trial court properly denied defendant's demurrer.

---

[4] The indictment reads, in part:

"That the above named defendant(s) on and between January 19, 1991 and February 9, 1992, in Washington County, Oregon, did unlawfully and recklessly, under circumstances manifesting extreme indifference to the value of human life, cause the death of Joshua Lee Pollard, a child under 14 years of age, by inflicting head injuries, said defendant having engaged in a pattern and practice of assault on Joshua Lee Pollard * * *."

Defendant next assigns error to the trial court's denial of his motion to suppress certain inculpatory statements he made to a police detective. Defendant asserts that those statements were induced by the detective's implied promises of treatment instead of criminal prosecution. He contends, therefore, that their admission at trial violated his constitutionally and statutorily protected right against compelled self-incrimination. US Const, Amend V; Or Const, Art I, § 12; ORS 136.425(1). The state maintains that, even if the detective promised defendant treatment, that promise was not connected with any offer, either express or implied, to forgo prosecution.

■ In reviewing the voluntariness of a defendant's statements, we are bound by the trial court's findings of historical fact if evidence supports them, but decide the ultimate legal question of voluntariness anew. *State v. Stevens*, 311 Or 119, 135, 806 P2d 92 (1991); *State v. Davis*, 98 Or App 752, 754, 780 P2d 807 (1989), *rev den* 309 Or 333 (1990); *cert den sub nom Davis v. Oregon*, 498 US 827 (1990). A confession or admission is deemed to be involuntary unless the state affirmatively shows that it was voluntarily made. *State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1980); *State v. Ely*, 237 Or 329, 332, 390 P2d 348 (1964). The state must prove voluntariness by a preponderance of the evidence. *State v. Stevens, supra*, 311 Or at 137; *State v. Davis, supra*, 98 Or App at 754.

■ Admissions obtained by an express or implied promise of immunity or leniency are involuntary as a matter of law under the Oregon Constitution, Article I, section 12. *State v. Ely, supra*, 237 Or at 334; *State v. Linn*, 179 Or 499, 507, 173 P2d 305 (1946); *State v. Kahut*, 71 Or App 243, 247, 692 P2d 138, *rev den* 299 Or 31 (1985).[5] A simple promise of treatment does not, by itself, render an admission involuntary. *See State v. Neblock*, 75 Or App 587, 590, 706 P2d 1020 (1985); *State v. Bounds*, 71 Or App 744, 746-48, 694 P2d 556, *rev den* 299 Or 732 (1985). However, an admission is considered involuntary if it was induced by a promise of treatment *instead of* prosecution. *State v. Neblock, supra*, 75 Or App at 590; *State v.*

---

[5] Because we can resolve the voluntariness issue under the Oregon Constitution, we do not address defendant's federal constitutional claim.

*Capwell*, 64 Or App 710, 716, 669 P2d 808 (1983); *State ex rel Juv. Dept v. S.C.G.*, 77 Or App 543, 713 P2d 689 (1986).

■ Such a promise need not be express. An implied promise of immunity from prosecution is sufficient to compel suppression of a confession:

> "The precise form of words in which the inducement is presented to the prisoner's mind is immaterial. It is sufficient if they convey to him the idea of temporal benefit or disadvantage, and his confession follows in consequence of the hopes thereby excited." *State v. Wintzingerode*, 9 Or 153, 163 (1881).

*Accord State v. Ely, supra*, 237 Or at 334; *State v. Linn, supra*, 179 Or at 510-14.

■ Here, defendant sought to suppress statements he made during a 40-minute interview with Hillsboro Police Detective Gossman on June 20, 1991. Defendant, who was not in custody, submitted to the interview voluntarily. During the interview, the following exchange occurred:

> "[DETECTIVE]:   Okay, Ray, what I'm doing is investigating a problem with a small child. That child happens to be your child, apparently.
>
> "[DEFENDANT]:   Okay.
>
> "* * * * *
>
> "[DETECTIVE]:   Okay. How did this happen, Ray? Do you have any idea?
>
> "[DEFENDANT]:   I have no idea whatsoever, Sir.
>
> "[DETECTIVE]:   Okay. What I understand is, that at times you do have a temper.
>
> "[DEFENDANT]:   It's a small one. I, I don't really consider it a big temper.
>
> "[DETECTIVE]:   Well, I can understand that, you know, I've got kids of my own, okay, and sometimes we tend to lose our temper.
>
> "[DEFENDANT]:   Yes, Sir.
>
> "[DETECTIVE]:   Okay, and we might, baby will be crying or whatever and, 'God, darn, shush up!' That can happen.
>
> "[DEFENDANT]:   It happens.

"[DETECTIVE]:   Okay. Is this what happened with you?

"[DEFENDANT]:   Ah, not that I can recollect.

"[DETECTIVE]:   *Well, like I told you before, you're going to have to be up front with me or I can't help you.*

"[DEFENDANT]:   Ahm, I'm up front.

"[DETECTIVE]:   Alright then, who would do something like this?

"* * * * *

"[DETECTIVE]:   Talking to your wife, Ray, she is of the opinion that maybe this happened with you.

"[DEFENDANT]:   Okay.

"[DETECTIVE]:   And things like, you know, not wanting the baby to you [*sic*] and things like that. That you're on edge because you don't have work at the present time . . .

"[DEFENDANT]:   Yeah.

"[DETECTIVE]:   . . . and I can understand this kind of getting you down. Ah, and like I said before, these things can happen and a man sometimes just isn't built to baby sit too well. You know what I mean?

"[DEFENDANT]:   Mh-hum.

"[DETECTIVE]:   And we get a little angry sometimes, so that's why I'm saying that if this happened, Ray, *let's get it over with. Let's get it done, get it up front and get on with your life and put your family back together.*

"[DEFENDANT]:   Yes, Sir.

"[DETECTIVE]:   As of 4:30, 4:29, I put both of your youngsters into protective custody.

"[DEFENDANT]:   Okay.

"[DETECTIVE]:   Which means that until we get this investigation done, they belong to the State Children's Services.

"[DEFENDANT]:   Okay.

"[DETECTIVE]:   And that includes your oldest.

"[DEFENDANT]:   Okay. Now, now, ah . . .

"[DETECTIVE]:   Go ahead.

"[DEFENDANT]:   Now will he be staying with us through this?

"[DETECTIVE]: That's entirely up to Children's Services.

"[DEFENDANT]: Up to them?

"[DETECTIVE]: I don't have any say so.

"[DEFENDANT]: Oh, okay.

"[DETECTIVE]: Ah, it's a procedure we use to protect the child. Both [children] in this case. Your youngest is in very, very critical condition.

"[DEFENDANT]: I was in to see him this morning.

"[DETECTIVE]: Ahm, we're talking about, like I say, if something happened and you want to get this thing up front and get it taken care of, I can help you in that respect. *Because I can tell you, you know, that if you don't, they'll just take it to a Grand Jury. That's what we will do.*

"[DEFENDANT]: Yeah.

"[DETECTIVE]: *And if the Grand Jury thinks that you've done this, it makes it real rough.* But the thing at this particular point, you have an opportunity to step forward with this thing and face it.

"[DEFENDANT]: Mh-hum.

"* * * * *

"[DEFENDANT]: Yeah, I come from, well, I don't know, I come from not really any abusive home life, ah, my father was extremely verbal and he threatened me from, I don't know, since I was, I don't know, young to 20. * * * I was threatened many times and me and my wife, you know, we've been going at edge on this one, you know. * * * We realize we did make a mistake by, whatever it is that may have happened. Ah, you know, both of, we, me and my wife, we both blame ourselves for it. Ah, . . .

"[DETECTIVE]: This kid? This kid?

"[DEFENDANT]: . . . yeah. And I don't know, I know *for* a fact some of it may stem from my home life, you know, the way that I [was] brought up. The way that I was treated by my father.

"[DETECTIVE]: Sure.

"[DEFENDANT]: And it may have rubbed, you know, and it rubs off on, on the kid, on the child itself. You know, on me.

"[DETECTIVE]: There's nothing you can do about it.

"[DEFENDANT]: And then it just runs down the family and it might, you know, I may have done it without thinking about it, you know. But as far as I know . . .

"[DETECTIVE]: *This is what I'm trying to tell you, is you know, I can help you with that, but you've got to be totally honest with me.*

"[DEFENDANT]: Yes, Sir.

"[DETECTIVE]: And if, you know, if you lost it for a second and you shook the baby, that happens, and let's take it from there and work it out. Did it happen when you were angry, maybe?

"[DEFENDANT]: It might have. I don't remember.

"* * * * *

"[DETECTIVE]: And when your dad, you know, you've had to live with this all your life, so it rubs off on you. And if you, it's just bound to happen and that's one of the things we can help you with. To get this taken care of and get it squared around.

"[DEFENDANT]: Well, me and my wife were, we're going to start counseling * * *.

"* * * * *

"[DETECTIVE]: Well, we have excellent people here to help with that. They're available. *But we have to get through this portion of it before we can get to that part.* And we have people who are probably some of the best in the United States right here, locally, that can help you to get rid of some of those feelings that are inside of you." (Emphasis supplied.)

Later in the interview, defendant told Gossman that he "jostled" Joshua on the day he was hospitalized. He described the jostling incident as an attempt to revive Joshua, who had "passed out" while in defendant's charge.

▮▮▮ After listening to a tape recording of the interview,[6] the trial court found that Gossman had, in fact, promised defendant treatment:

"So there's not much question from these facts that the

---

[6] During the suppression hearing, in addition to the taped interview, the trial court also heard testimony from Gossman, in which he generally described the circumstances of the interview. Defendant did not testify during the suppression hearing. Because of its generalized content, Gossman's testimony appears to have been largely irrelevant to the trial court's suppression ruling, as it is to our review.

detective intended and, in fact, implied and stated to the defendant repeatedly that there was help available to him if he made a statement to the detective that the detective wanted to hear."

At the same time, the trial court concluded that Gossman did not expressly or impliedly promise defendant treatment or leniency instead of prosecution. Accordingly, the trial court denied the motion to suppress and, at trial, admitted the taped interview.

We disagree. The emphasized statements — statements made *before* defendant's son died — make sense only if Gossman was promising treatment of defendant's abusive propensities *in lieu* of prosecution. *See State v. Capwell, supra,* 64 Or App at 717 (suppressing defendant's confession of sex abuse where, based on interviewing officer's statements, "[d]efendant's inference that his confession would assure him of treatment rather than eventual incarceration was reasonable under the circumstances"). *Accord State v. Ely, supra.* That accords with the ostensibly sympathetic, "these things happen" tenor of the parties' conversation in which the detective professed to empathize, man-to-man, with defendant's situation and repeatedly purported to be interested in "helping" him.

Under the state's contrary reading, defendant was to "get on with his life" — by going to jail. His family was to be "put back together" — without him. "They" would not have to "take it to a grand jury" — because defendant would already have confessed. We cannot subscribe to such an interpretation.

Given these considerations, we conclude that the state failed to sustain its burden of proving the voluntariness of defendant's statements. In so holding, we emphasize that this case is materially different from *State v. Bounds, supra,* and *State v. Neblock, supra.* In *Bounds*, the defendant was expressly told that he would be prosecuted. 71 Or App at 747-48. That did not happen here. In *Neblock*, defendant confessed to sex abuse five days after a social worker, not a police officer, had told defendant that both treatment and incarceration were among the options the court would consider and that " 'taking responsibility for one's own behavior' would simply be one variable bearing on the court's choice

among options." 75 Or App at 589-90. Here, the detective's promises were contemporaneous with defendant's confession, and the only reference to "options" was the detective's suggestion that if defendant was candid, "I can help you," but if he wasn't, "they'll just take it to a grand jury." The *quid pro quo* was apparent.

We address, finally, whether the error in admitting defendant's statement was harmless. Error that violates the Oregon Constitution is harmless only if there is substantial and convincing evidence of guilt and little likelihood that the error affected the verdict. *State v. Walton*, 311 Or 223, 230-31, 809 P2d 81 (1991). We cannot conclude that the error here was harmless under that standard. The defense depended on the theory that someone other than defendant, perhaps defendant's wife, had inflicted the fatal injury. Although there was substantial and convincing evidence that defendant had assaulted his son on various occasions *before* June 19, 1991, defendant's statements to Gossman that he had shaken his son on that date provided the final link to Joshua's death. Because the error was not harmless, defendant's conviction must be reversed.

Reversed and remanded for new trial.

**RIGGS, J.,** concurring in part; dissenting in part.

I agree with the majority's conclusion that the trial court properly denied defendant's demurrer to the indictment. However, because I believe that defendant's admissions were not induced by implied promises of leniency, I respectfully dissent.

The only point of disagreement here is whether Detective Gossman's statements "reasonably can be construed as impliedly promising that defendant would get treatment *instead of* incarceration if he admitted the criminal charges." *State v. Capwell*, 64 Or App 710, 715, 669 P2d 808 (1983). (Emphasis supplied.) I believe that Gossman's statements to defendant regarding the availability of treatment do not amount to the *quid pro quo* that the majority finds so obvious.

The majority asserts that certain exchanges during the course of the interview "make sense only if Gossman was

promising treatment of defendant's abusive propensities *in lieu* of prosecution." 132 Or App at 538. (Emphasis in majority.) I disagree. In coming to this conclusion, I am mindful of the distinction between " 'mere adjuration' on the one hand, and adjuration accompanied by inducement on the other." *State v. Linn*, 179 Or 499, 510, 173 P2d 305 (1946). (Citation omitted.) A promise of treatment, without more, is not enough to require suppression. *State v. Neblock*, 75 Or App 587, 590, 706 P2d 1020 (1985). Taking Gossman's statements in context, there is no indication from the content of the interview itself or Gossman's testimony at the suppression hearing that he promised defendant treatment in lieu of prosecution. Gossman's statements to defendant to "get it up front and get on with your life" and offering "help" for defendant if he was "totally honest with [Gossman]" cannot reasonably be read so as to promise or infer that defendant would be immune from future prosecution if he confessed.

The statements Gossman made to defendant are fundamentally different than the implied promises of leniency this court and the Supreme Court have previously held to be unlawful. For instance, in *State v. Capwell, supra*, the interrogating officer testified that the substance of his conversation with the defendant, which ultimately gave rise to incriminating admissions, "centered around * * * treatment 'instead of' or 'as opposed to' being incarcerated." 64 Or App at 716. The trial court, in suppressing the defendant's confession, concluded:

> "Any confession or admissions made by [d]efendant were predicated upon the implied promise that treatment, not incarceration, would be the outcome and defendant would not be required to attend Court." 64 Or App at 714.

Similarly, in *State v. Ely*, 237 Or 329, 390 P2d 348 (1964), the defendant was questioned by individuals who assured him that if he confessed they would not seek prosecution, but that there was no guarantee that someone else would not prosecute. From those statements the court concluded that "[t]he defendant could have believed that if these three men would not prosecute him no one else was likely to do so." 237 Or at 334.

Here, Gossman never stated or implied that defendant would avoid prosecution if he confessed. Rather, he

made assurances that counselling was available. Advice that "treatment is an option, or that confession is a prerequisite to treatment is not the same as promising * * * immunity from prosecution." 75 Or App at 590. On the basis of all the facts and circumstances, I would conclude that defendant's statements were voluntarily made, and that the trial court properly denied his motion to suppress.

I respectfully dissent.

Richardson, C. J., and Warren and Deits, JJ., join in this concurring and dissenting opinion.