Argued and submitted May 11, affirmed September 30, 2009

# STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

# SHAWN WESLEY FIELD,
*Defendant-Appellant.*

Benton County Circuit Court
CM0520645; A134181

218 P3d 551

Daniel H. Koenig argued the cause and filed the brief for appellant.

Rolf Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Edmonds, Presiding Judge, and Wollheim, Judge, and Sercombe, Judge.

EDMONDS, P. J.

**EDMONDS, P. J.**

Defendant appeals convictions for murder, ORS 163.115, assault, ORS 163.175, criminal mistreatment, ORS 163.205, and manufacture of a controlled substance, *former* ORS 475.999 (2003), *renumbered as* ORS 475.904 (2005), all relating to the murder of his girlfriend's three-year-old child. He raises three assignments of error on appeal. In his first assignment of error, defendant argues that the trial court erred in admitting statements he made to police while he was in custody and after he allegedly had asserted his right to counsel. He also argues that the trial court abused its discretion when it denied his motion for a mistrial and that the court improperly imposed consecutive sentences without underlying jury findings to support those sentences. We affirm and write only to discuss defendant's assertion that the trial court improperly denied his motion to suppress; we reject his other assignments of error without discussion.

In reviewing the denial of a motion to suppress, we are bound by the trial court's findings of historical fact when there is constitutionally sufficient evidence in the record to support them. *State v. Caprar*, 214 Or App 434, 439, 166 P3d 567 (2007), *rev den*, 345 Or 317 (2008). "If findings are not made on all [historical] facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the [trial court's] ultimate conclusion[.]" *Ball v. Gladden*, 250 Or 485, 487, 443 P2d 621 (1968). We then assess whether those facts are sufficient to meet constitutional standards. *State v. Holcomb*, 213 Or App 168, 173, 159 P3d 1271, *rev den*, 343 Or 224 (2007). Here, the trial court made the following detailed findings regarding defendant's conversations with police officers and his assertion of his right to counsel:

> "On the afternoon of June 3, 2005[,] officers began a homicide investigation involving the death of [the minor child]. The defendant, Shawn Field, was interviewed by law enforcement personnel at the scene and asked to remain at the scene. Later in the afternoon Corvallis police Detective Jason Harvey asked the defendant to go with police officers to the law enforcement center for additional interviews.

Although he was not under arrest at the time, at approximately 3:30 in the afternoon Detective Harvey advised the defendant of his *Miranda*[1] warnings, and the defendant acknowledged that he understood his rights and indicated that he had no questions about his rights. He voluntarily spoke with Detective Harvey. At one point during the interview the defendant told the detective that, quote, 'This is something where I need to get a lawyer. I don't know what to do now,' unquote. Now, when the detective followed up with the fact that defendant had mentioned a lawyer[,] the defendant told Detective Harvey that he didn't want to get a lawyer and wanted to talk with Detective Harvey adding, quote, 'I'll talk to you right now,' end quote. At approximately 4:00 p.m. the defendant told Detective Harvey 'I'm just wondering if I need—I mean, am I supposed to get an attorney to consult anything? What am I supposed to do?' Detective Harvey told the defendant he couldn't give him legal advice, and that if he wanted an attorney he had the right to contact one. The defendant responded, quote * * * 'I don't want to not—I didn't do it so I don't want to fight it.' Lieutenant Hendrickson then asked the defendant if he could ask a couple of questions. The defendant answered 'Sure' and voluntarily continued to answer questions until approximately 7:00 p.m. The defendant then went to another interview room and lied down on the couch. At approximately 9:00 p.m. the defendant said he wanted to leave, and Detective Harvey asked Officer Hurley to take the defendant wherever he wanted to go. While en route the district attorney told detectives to bring the defendant back and to arrest him for manufacturing a controlled substance. When the defendant arrived back at the Law Enforcement Center he was arrested and taken into custody, was not re-advised of his *Miranda* rights, and voluntarily answered additional questions.

"On Sunday morning, June 5, 2005[,] the defendant called friends and asked them to have his parents contact attorney Steve Ensor. At approximately 3:00 p.m. Detective Karin Stauder visited the defendant in the jail. Her initial purpose was to see if the defendant could tell her someone to call to take care of his cat. She engaged the defendant in conversation about a request form that he had submitted to corrections staff regarding speaking with a mental health representative. She did not advise the defendant of his

---

[1] *Miranda v. Arizona*, 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

*Miranda* warnings. Detective Stauder asked the defendant if he wanted to talk to a counselor or a police officer. The defendant stated that he just wanted to talk to someone, have a conversation. Detective Stauder reminded the defendant that he had previously told detectives that he didn't want to talk to anybody and wanted an attorney. That was her recollection, although there was not evidence that in fact the defendant had done that. It was presented at the pretrial hearing. The defendant told Detective Stauder that after he was arrested he said he guessed he should have an attorney and a phone call, and specifically he said, 'Well, we walked over from here and he was arresting me and I said—I said, 'I guess I should have an attorney now and a phone call,['] and then I just—I thought since I was being arrested that I should be—I mean, I thought that would be the smart thing, because before I was arrested I was—I mean, I told them everything they asked me. I answered every question.' and it goes on. And then Detective Stauder asked the defendant, 'Well, do you want to talk to me? If you do—because I kind of want to go through the part that you—you know, you have a right not to talk to me, you have a right to have an attorney. You're already in what we call is you're invoked, which means that you don't want to talk to us, and once you do that I can't talk to you, but if you want to waive that right and you want to talk to me I'll be glad to listen, Shawn, but I just want to make sure that you're protecting yourself here,' and the defendant's response was 'Oh, I'll talk to you. I mean—I mean, I have the right to s[ay] no or end the conversation,' and the defendant continued to voluntarily make statements and answers to Detective Stauder's questions.

"At approximately 4:30 attorney Steve Ensor contacted the jail and said that he was coming over to see the defendant. He was instructed by jail staff that the defendant was not available at that time because it was supper time and instructed to call back later. When he called back later, approximately an hour later, he was—again requested to speak with—to see about coming over to speak with [defendant] and was told that he was not available because he was in a special visit. Corrections deputies and law enforcement did not advise the defendant that Mr. Ensor was attempting to get ahold of him * * *."

Based on those findings, the court granted defendant's motion to suppress all statements he made to police

after "Mr. Ensor's 4:30 telephone call informing the jail staff that he'd been asked to represent the defendant and was coming to the jail to see him * * *." However, the court denied the motion as to any statements made by defendant to law enforcement officers before 4:30 p.m. on June 5, 2005.

■ On appeal, defendant asserts that the trial court "erred in denying that part of defendant's motion to suppress statements made by the defendant prior to 4:30 p.m. on Sunday, June 5, 2005 obtained in violation of *Miranda* and after he had invoked his right to counsel." His assertions divide into two distinct arguments: (1) the court should have suppressed statements made by defendant after his arrest because he was not given *Miranda* warnings at that time; and (2) in any event, all defendant's statements to police on June 5, 2005, should have been suppressed because they were the result of an unlawful interrogation after defendant had unequivocally invoked his right to counsel. The state responds that, "[t]he officers in this case fully advised defendant of his *Miranda* rights, and no subsequent events required further warnings. Moreover, defendant never invoked his right to counsel and, even if he did, he initiated further discussion of the crimes being investigated * * *." Finally, according to the state, even if defendant's statements were incorrectly admitted, any error was harmless.

■ We turn first to defendant's contention regarding the giving of *Miranda* warnings. "Under the Oregon Constitution, *Miranda*-like warnings are required when the defendant is in full custody and may be required in circumstances that, although they do not rise to the level of full custody, create a setting which judges would and officers should recognize to be compelling." *State v. Zelinka*, 130 Or App 464, 473, 882 P2d 624 (1994), *rev den*, 320 Or 508 (1995) (quoting *State v. Smith*, 310 Or 1, 7, 791 P2d 836 (1990), and *State v. Magee*, 304 Or 261, 265, 744 P2d 250 (1987) (internal quotation marks omitted). Similarly, under the United States Constitution, *Miranda* warnings must be given when a person's freedom has been significantly restrained. *Smith*, 310 Or at 8. Here, the trial court found, and it is undisputed, that defendant was advised of his *Miranda* rights before officers commenced questioning him in the afternoon of July 3, 2005.

However, he was not re-advised of those rights when he was arrested in the evening of the same day. In defendant's view, that failure to re-administer *Miranda* warnings should have resulted in the exclusion of "all statements made by the defendant after his arrest * * *."

■■ To determine whether under state law, a defendant must be re-advised of his *Miranda* rights, we look at whether, under the totality of the circumstances, a reasonable person could believe that his or her rights have changed since the time they were originally given. *See State v. Davidson*, 252 Or 617, 620, 451 P2d 481 (1969) (no need to re-advise the defendant of his rights when the original warnings had not been limited to any specific conduct and a short period of time had passed since the warnings were given); *Zelinka*, 130 Or App at 475 (noting that the warnings the defendant had been given were not limited in context); *State v. Rivas*, 99 Or App 23, 29, 781 P2d 364 (1989) (*Miranda* warnings need not be re-administered when questioning turns to a different crime); *State v. Eidson*, 73 Or App 719, 727-28, 700 P2d 285 (1985) (the court evaluates the sufficiency of *Miranda* warnings based on the surrounding circumstances); *cf. State v. Metz*, 131 Or App 706, 711-12, 887 P2d 795 (1994) (*Miranda* warnings given by police officers during interrogation were not sufficient to eliminate requirement that the defendant be advised of his rights before psychological examination the next day where circumstances had materially changed since warnings originally were given). Likewise, under federal law, we must consider the totality of the circumstances to determine whether successive interrogations require a suspect to be re-advised of his *Miranda* rights; there is no *per se* rule that a suspect must be re-advised based merely on the passage of time or a change in questioners. *U.S. v. Andaverde*, 64 F3d 1305, 1312 (9th Cir 1995); *see U.S. v. Rodriguez-Preciado*, 399 F3d 1118, 1128-30 (9th Cir 2005) (no need to re-administer *Miranda* warnings on second day of questioning suspect); *People of Territory of Guam v. Dela Pena*, 72 F3d 767, 770 (9th Cir 1995) (*Miranda* warnings given before suspect was in custody need not be re-administered before custodial interrogation where no intervening events suggested that suspect's rights had changed). Thus, we must determine

whether the original warnings were sufficient, under all the circumstances, to fairly advise defendant of his rights in the context of the later questioning.

Here, officers advised defendant of his rights at the police station before questioning him about the circumstances surrounding the victim's death. He remained at the police station for some hours and answered questions while there. Several hours later, defendant asked to leave the police station and was permitted to do so. While driving defendant to the location to which he had asked to be taken, the officers received instructions to arrest him, and they then drove him back to the police station. Upon their arrival at the police station, defendant was formally arrested.

Under the described circumstances, we conclude that nothing occurred that would lead a reasonable person to believe that his *Miranda* rights had changed. The warning defendant was given at the police station in the afternoon of July 3 was not limited in scope. Furthermore, defendant was never outside the presence of the police from the time that he was first advised of his *Miranda* rights until the time of his arrest. Additionally, when he met with Detective Stauder two days later, defendant indicated that he was aware of and understood his rights. Before she questioned him, Stauder reminded him that he did not have to speak with her and had a right to an attorney. Defendant responded by acknowledging his rights, stating that he had "the right to s[ay] no or end the conversation." All the foregoing circumstances, taken together, persuade us that a reasonable person in defendant's position, having previously been advised of his *Miranda* rights, would have had no reason to believe that those rights had changed. For the above reasons, the officers were not required to formally re-advise defendant of his rights at the time of his arrest.

We next turn to the issue of whether defendant invoked his right to counsel and whether the statements he made to Stauder on June 5, 2005, should have been excluded as having been improperly obtained in violation of *Edwards v. Arizona*, 451 US 477, 101 S Ct 1880, 68 L Ed 2d 378 (1981). During a custodial interrogation, a suspect has a "right of assistance of counsel" that "arises out of his [or her] right

against self-incrimination as provided in Article I, section 12, of the Oregon Constitution, and the Fifth Amendment to the United States Constitution." *State v. Meade*, 327 Or 335, 339, 963 P2d 656 (1998) (footnote omitted). Accordingly, when a suspect in police custody unequivocally invokes the right to counsel, all police questioning must cease. *Id.* However, where the request is equivocal, the police are permitted to "follow up with questions intended to clarify whether the suspect intended to invoke his [or her] right to counsel." *Id.* "An officer's duty to clarify a suspect's equivocal invocation may be obviated if the suspect initiates further substantive conversation concerning the investigation before the officer has clarified the suspect's intent." *Holcomb*, 213 Or App at 174. Furthermore, whether a suspect's invocation of his or her right to counsel is equivocal or unequivocal, the suspect may later waive that right. *Meade*, 327 Or at 339. We determine whether a defendant has made an unequivocal request for counsel "by analyzing the request in light of the totality of the circumstances to determine whether 'a reasonable officer in the circumstances would have understood that the suspect was invoking the right to counsel.' " *Holcomb*, 213 Or App at 180 (quoting *State v. Dahlen*, 209 Or App 110, 117, 146 P3d 359, *modified on recons*, 210 Or App 362, 149 P3d 1234 (2006)).

Defendant went to the police station to talk to detectives, and their interview with him began at approximately 3:30 p.m. On two occasions during that interview, defendant made reference to obtaining an attorney. The first reference occurred after defendant had been talking to Detective Harvey for about 20 minutes. At that point, Harvey informed defendant that there was evidence that the victim had been sexually abused and asked defendant whether he knew anything about that. The conversation between defendant and Harvey proceeded as follows:

> "[Defendant]: I do not know anything about this and this is something where I need to get a lawyer, I don't know what to do now, (unclear) I never touched her and I would never touch her, I will take blood whatever, I have never touched a little girl, and I will never touch a little girl, I never touched mine. Ok, and I'm adamant about that.

> "[Harvey]: Ok . . .

"[Defendant]: Ok? I'm adamant about that . . .

"[Harvey]: Fair enough, fair enough, you've mentioned, you've mentioned a lawyer, I don't want to . . .

"[Defendant]: I don't want to get a lawyer, I don't want to go this route, I want to talk to you . . ."

Based on all the circumstances, we conclude defendant did not unequivocally invoke his right to counsel at that time. Although, as part of his statements to Harvey, defendant observed that the situation was one where a lawyer would be needed, he continued talking to the officer, discussing the substantive issues of the investigation before the officer could ask any clarifying questions. As a whole, defendant's statements at that point would not lead a reasonable officer to understand that defendant was invoking his right to counsel at that time. Furthermore, at the first opportunity, the officer asked defendant about his reference to getting a lawyer and defendant unequivocally stated that he did not want to get an attorney and continued talking.

Later, about 40 minutes into the interview, at 4:08 p.m., defendant again referenced his right to counsel as follows:

"[Harvey]: * * * I talked to you about the sexual assault issue, ok? One way that we can help, help to eliminate you if you're not responsible, is to collect physical evidence from you that would help eliminate you.

"[Defendant]: Uh-huh . . .

"[Harvey]: So what we'd like to do is take some swabs from you, do you have any problem with that?

"[Defendant]: Ok, I don't have a problem helping her, I'm just wondering if I need, I mean am I supposed to get an attorney to consult or anything? I have no problem with you taking the stuff from me, 'cuz I didn't do it, I have no problem, ok? But what are my, I mean, (unclear)

"[Harvey]: (unclear)

"[Defendant]: What am I supposed to do? I want to help out, I didn't do it . . .

"[Harvey]: Ok . . .

"[Defendant]: So . . .

"[Harvey]: I can't give you legal advice, if you want an attorney, you have every right to contact one. That's a decision you're going to have to make.

"[Defendant]: I don't wanna not, I didn't do it, I didn't do it, so I don't want to fight it, I didn't do anything."

In context, defendant's reference to his right to an attorney was ambiguous. Rather than stating that he wanted to speak with counsel at that time, he asked the detective whether or not he needed an attorney. The officer immediately informed defendant that he had "every right" to contact an attorney, and defendant's response indicated that he did not wish to do so. Thereafter, a second detective asked defendant whether he could "ask a couple questions then" and defendant responded "[s]ure" and continued with the interview. As before, defendant's equivocal reference to an attorney was followed by his clarification that he wished to proceed with the interview. We conclude that, under the circumstances, defendant did not invoke his right to counsel on either occasion.

We next turn to defendant's June 5, 2005, telephone call "requesting friends get in touch with Attorney Ensor," which defendant argues constituted an invocation of his right to counsel. Defendant relies on *State v. Moore*, 72 Or App 202, 695 P2d 936 (1985), in support of his contention. In *Moore*, we concluded that the defendant had invoked his right to counsel where a jail log notation made by a desk officer at the jail an hour after the defendant was booked stated that he had "MADE CALL TO MOM TO GET ATTY. CONTACT MADE." *Id.* at 204-05 (capitalization in original). We imputed the desk officer's knowledge to the officers who had been interrogating the defendant and concluded that the defendant's statements subsequent to that telephone call should have been suppressed.

Here, in contrast to *Moore*, defendant points to no evidence in the record that, at the time he made the call, any law enforcement officer heard his request that his friends get in touch with an attorney on his behalf. The record does not contain a log of the telephone call, and the officer who requested a record of defendant's telephone calls testified

that, although the call was recorded, he did not listen to the recording at the time. Instead, he put it in his file cabinet and listened to it sometime later. Although the trial court did not make an express finding regarding whether officers listened to defendant's telephone call, the record supports such a finding that they did not, and such a finding is consistent with the trial court's ultimate conclusions. Pursuant to *Ball*, 250 Or at 487, we therefore presume that the trial court implicitly found that the officers had no knowledge of the content of defendant's telephone call at the time of Stauder's June 5 meeting with defendant.[2] In light of the foregoing, we conclude that the trial court properly determined that defendant's statements to Stauder made before 4:30 p.m. on June 5, 2005, were not subject to suppression.

Affirmed.

---

[2] Based on all the circumstances recounted in this opinion, defendant challenges the trial court's conclusion that his statements were voluntary. We agree with the trial court's determination that the record does not support defendant's assertion.