Argued and submitted October 17, 2013, convictions on Counts 4, 5, and 6
reversed and remanded, otherwise affirmed March 18, 2015

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## PAUL A. SPIELER,
*Defendant-Appellant.*

Malheur County Circuit Court
10073080C; A148904

346 P3d 549

George W. Kelly argued the cause and filed the brief for appellant.

Jennifer S. Lloyd, Attorney-in-Charge, argued the cause for respondent. On the brief were Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Christina M. Hutchins, Senior Assistant Attorney General.

Before Duncan, Presiding Judge, and Haselton, Chief Judge, and Schuman, Senior Judge.*

HASELTON, C. J.

---

* Haselton, C. J., *vice* Wollheim, S. J.

## HASELTON, C. J.

Defendant, who was convicted after a jury trial of two counts of first-degree sexual abuse, ORS 163.427, and one count of second-degree sodomy, ORS 163.395, appeals. He asserts that the trial court erred in denying his motion to suppress evidence, and in denying his motion for a mistrial made during the prosecutor's closing argument. He also argues that nonunanimous jury verdicts are unconstitutional. We reject the latter argument without discussion. As explained below, we conclude that the trial court correctly denied defendant's motion to suppress, but erred in denying his motion for a mistrial. Accordingly, we reverse and remand.

## MOTION TO SUPPRESS

We begin with the denial of defendant's motion to suppress. In particular, as recounted more fully below, defendant sought to suppress statements that he made during a police interview, as having been involuntarily given in response to improper inducement. In reviewing the trial court's determination as to purported involuntariness,

"we accept the court's findings of fact if there is any evidence to support them. If findings are not made on such facts, and there is evidence from which such facts could be decided more than one way, we will presume that the facts were decided in a manner consistent with the ultimate conclusion, *e.g.*, voluntariness or lack thereof, made by the trial court. Whether the facts found by the trial court are sufficient to sustain the trial court's ultimate conclusion regarding voluntariness is a question of law that we review for legal error."

*State v. Ruiz-Piza*, 262 Or App 563, 564, 325 P3d 802 (2014) (citations and internal quotation marks omitted).

The complainant is defendant's biological niece and adopted daughter, M. In 2008, M, who was then a teenager, made disclosures that defendant had sexually abused her when she was younger. M was subsequently interviewed at an assessment program, the STAR Center. At the request of Detective Perkins, who arranged for and observed the STAR Center interview, M made a pretext call to defendant

during which she asked defendant why he had abused her. Defendant responded variously that he did not remember, that he did not want to discuss it over the phone, that his wife had not been a good wife to him, and that M was, in a way, taking his wife's place. He also stated that he was "not proud of it" and "[i]f I could just get it to go away it would be great."

Following the pretext call, Perkins obtained a warrant to search defendant's home for evidence of sexual abuse, and, in the course of executing the warrant, he encountered defendant. Perkins informed defendant of M's allegations, advised him of his *Miranda* rights, and asked defendant (who was not under arrest) if he would come to the police station to be interviewed. Defendant agreed and accompanied Perkins.

Once at the police station, Perkins confirmed that defendant remembered the *Miranda* warning. The ensuing interview, which was conducted in a small room, lasted approximately 30 minutes. Defendant initially denied any sexual contact with M and indicated that he had no memory of the events she had disclosed. During the interview, Perkins remarked that it was odd for defendant to say he did not remember, rather than that it "didn't happen," and the following exchanges occurred:

"PERKINS: * * * [T]he way I work I believe, number one, I believe victims when they talk, okay, unless there's some extenuating circumstance, you know, like a major custody battle, that sort of thing, which I don't see in this case. Uh, it looks like the kids pretty much are separated the way they want to be separated and there hasn't been a problem with it.

"Um, *but to your benefit*, and like I said, we're recording, *it's best to come out with what happened other than, you know, me having to tell a judge that, you know, it took a half an hour to*—I'm not really into that; I don't really like to sit here and berate. *People have issues, people have problems that need to get help, and you know, that's what we would like to see happen. Um, but it doesn't—I just don't want it to look bad on you that you, you know, you'd lie up and down, so it's best just to get it out because the truth's going to come out.*

"[DEFENDANT]:   Mmm hmmm."

(Emphasis added.)

There followed some general discussion of defendant's activities with M, as well as some discussion of the allegations that M had made, and then the following exchange occurred:

"[DEFENDANT]:   I know you know more than you're letting me know, that you think you know, that's kind of a triple statement there. I did not undress her. I did not put a vibrator inside her.

"PERKINS:   No one said that.

"[DEFENDANT]:   Right.

"PERKINS:   That would make you a monster, about putting something inside her. But the thing, your finger, they didn't say anything else. I think you're a man that has some issues and I don't know where they come from, I don't know your family, your past, what happened to you as a kid; I don't know anything about that. I mean, this is the first time I've met you. But I do know having done this for a long time that *people have issues and they need to get help. They need to get past it. I mean you're still young, Paul, but you need to get this off your chest and you need to get the help.* Do you understand that?

"* * * * *

"PERKINS:   Look, you can't get anything by lying, and not being a man and facing up to, you know, your responsibilities.

"[DEFENDANT]:   No. I know. I'm just * * * I know."

(Emphasis added.)

Thereafter, Perkins asked defendant, "Why did it happen?" and defendant responded variously that his relationship with his wife had been bad, and that M had been like a friend to him and not like his own biological child, as she was adopted. Defendant then acknowledged that he had had sexual contacts with M.

Defendant was charged with five counts of first-degree sexual abuse and one count of second-degree sodomy,

with the indictment alleging that the conduct occurred at various times between January 2000 and May 2006. Defendant moved before trial to suppress his statements made during the interview, arguing that they were obtained involuntarily, in violation of Article I, section 12, of the Oregon Constitution. In particular, defendant argued that Perkins's statements implied a promise of leniency and suggested that defendant needed to admit his crimes in order to obtain help. At the suppression hearing, Perkins acknowledged that the interrogation had involved a "carrot-and-stick approach," whereby a confession could benefit defendant by allowing him to get help but continued nondisclosure would "look bad" to the court. Defendant testified that he believed from his interaction with Perkins that he would receive psychological help and that he needed to cooperate or "the penalty would get worse." The trial court denied defendant's motion to suppress stating:

> "Throughout the tape Detective Perkins used a very, I would describe it as a very soft, low-toned conversation. At no time was his voice even raised. At no time did I hear any threats or promises. He was certainly encouraging [defendant] to disclose what happened, but I heard nothing that would suggest he was intimidating, making any improper promises, or anything—did anything that made the statement involuntary."

On appeal, defendant reiterates his arguments, contending that his admissions were obtained in violation of Article I, section 12.[1] For purposes of Article I, section 12, "'a confession is initially deemed involuntary. Before a confession can be received in evidence, the state must show that it was voluntarily given, that is, made without inducement through fear or promises, direct or implied.'" *Ruiz-Piza*, 262 Or App at 573 (quoting *State v. Mendacino*, 288 Or 231, 235, 603 P2d 1376 (1979)). A "simple promise of treatment does not, by itself, render an admission involuntary." *State v. Pollard*, 132 Or App 538, 543, 888 P2d 1054,

___

[1] Defendant does not make any separate arguments concerning admissibility under ORS 136.425(1), which limits the admissibility of certain admissions and confessions. *See generally State v. Powell*, 352 Or 210, 282 P3d 845 (2012) (analyzing admissibility of statements made in response to promises by private investigators that a theft investigation would be handled "in house" rather than turned over to the police).

*rev den*, 321 Or 138 (1995) (citing *State v. Neblock*, 75 Or App 587, 590, 706 P2d 1020 (1985)); *State v. Bounds*, 71 Or App 744, 746-48, 694 P2d 566, *rev den*, 299 Or 732 (1985). An admission is, however, considered involuntary if a police officer makes statements that "could be reasonably construed as an implied promise of treatment instead of incarceration in return for a confession." *Neblock*, 75 Or App at 590.

Defendant relies primarily on *Pollard*, in which we reversed a denial of suppression—and which, defendant asserts, involved directly analogous circumstances. The state remonstrates that, notwithstanding certain similarities, *Pollard* is materially distinguishable and that this case is more akin to *Neblock*, in which we sustained a denial of suppression. For the reasons that follow, we agree with the state.

We begin with *Pollard*. There, the defendant was convicted of murder by abuse of his infant, who had died of "shaken baby syndrome." 132 Or App at 540. After the infant had been hospitalized, but before his death, the defendant, who was not then under arrest, was interviewed at a police station for approximately 40 minutes. *Id.* at 544. During the interview, a detective suggested to the defendant that he might have lost his temper with the infant and that the defendant needed "to be up front with me or I can't help you." *Id.* at 545. The officer indicated that it was normal to become frustrated caring for an infant and told the defendant, "let's get it over with. Let's get it done, get it up front and get on with your life and put your family back together." *Id.* They then discussed the infant's condition, and the officer again stated that, "if something happened and you want to get this thing up front," the officer could help the defendant, and that, "if you don't, they'll just take it to a Grand Jury. That's what we will do." *Id.* at 546. The officer added, "If the Grand Jury thinks that you've done this, it makes it real rough." *Id.* The defendant then began to discuss his family's history of abuse and that he and his wife wanted to start counseling. The officer indicated that "we have excellent people here to help with that. They're available. But we have to get through this portion of it before we can get to that part." *Id.* at 547.

In determining that the defendant's subsequent statements were involuntary, we concluded that the officer's statements, made before the infant died, "make sense only if [the officer] was promising treatment of [the] defendant's abusive propensities *in lieu* of prosecution." *Id.* at 548 (emphasis in original). In particular, we noted the "these things happen" tenor of the conversation, and the statements that the defendant could "get on with his life" and put his family back together—along with the statement implying that the grand jury did not need to be involved if the defendant confessed—and concluded that there had been an implicit promise of treatment instead of prosecution. *Id.* at 548-49.

In so holding in *Pollard*, we emphasized that the circumstances there were dispositively different than those in *Neblock*. In *Neblock*, a social worker employed by the state investigated the defendant after a child made allegations of sexual abuse. The social worker told the defendant that there would be a police investigation and that the police would be contacting him. She specifically indicated that "treatment and incarceration were options that a court would consider," and indicated that the defendant "taking responsibility" would be a factor in determining appropriate treatment. 75 Or App at 589. The social worker, however, made "no promises or guarantees." *Id.* As we observed in *Neblock*, the defendant acknowledged that there were no explicit promises:

> "Rather, he argues that the social worker presented information about the way a confession would affect the court's choice among dispositional options in such a way as to constitute an implied promise of treatment as opposed to incarceration and that he had reasonably relied on that implied promise as an inducement for his confession."

*Id.* at 590.

The trial court in *Neblock* denied suppression of the defendant's confession, and we affirmed. We concluded that there was "nothing in the statements made to [the] defendant that could reasonably be taken as an implied promise of immunity from prosecution should he confess. *Advising defendant that treatment is an option, or that confession is a*

*prerequisite to treatment, is not the same as promising him immunity from prosecution." Id.* (emphasis added). That distinction was critical to our consideration in *Pollard,* where we explained:

> "[The social worker in *Neblock*] had told defendant that both treatment and incarceration were among the options the court would consider and that 'taking responsibility for one's own behavior' would simply be one variable bearing on the court's choice among options.' 75 Or App at 589-90. Here, the detective's promises were contemporaneous with defendant's confession, and the only reference to 'options' was the detective's suggestion that if defendant was candid, 'I can help you,' but if he wasn't, 'they'll just take it to a grand jury.' The *quid pro quo* was apparent."

132 Or App at 548-49.

Defendant posits that the present case is fundamentally similar to *Pollard,* in that the detective here suggested that defendant's actions may have been beyond his control and due to his family history and that defendant needed help or treatment. Defendant also characterizes Perkins's comments as implying that "no help could be forthcoming until the defendant came out with the truth" and that "the alternative to coming out with the truth and getting help was going to a judge or the grand jury and criminal sanctions coming into play."

We agree that there are some similarities between this case and *Pollard.* However, there are also critical differences— differences that contradict defendant's characterization of the implications of Perkins's comments to defendant. As for similarities, certain aspects of the interrogation techniques used were similar. Both Perkins and the detective in *Pollard* suggested that the defendants' actions might have something to do with issues from their past, that the defendants needed to discuss what happened to "get past it," and that the defendants needed "help," with the strong implication being that psychological help was needed. That is, both officers indicated to both defendants that the defendants needed to acknowledge what they had done in order to be "helped."

Nevertheless, this case is different from *Pollard* in at least one dispositive respect. As noted, in *Pollard*, the detective suggested that the defendant had two distinct alternatives: He could either admit what had occurred and get it "taken care of" and get "help" or, alternatively, if the defendant did not do that, the case would be taken "to a Grand Jury" and it would be "real rough." 132 Or App at 546. That is, if the defendant cooperated and admitted his conduct, he could obtain assistance *in lieu* of prosecution." *Id.* at 548 (emphasis in original); *see also id.* at 549 ("The *quid pro quo* was apparent.").

Here, in contrast, there were no suggestions by Perkins that a confession could, or would, preempt a prosecution. Rather, Perkins's statements presumed that there would be a prosecution and pertained to the effect of defendant's conduct on that prosecution, *e.g.*, references to "having to tell a judge that, you know, it took a half an hour to" get defendant to confess, and that Perkins did not "want it to look bad on you that you, you know, you'd lie up and down" about what had occurred. *See also Neblock*, 75 Or App at 589 (noting that the social worker's remarks expressed that "'taking responsibility for one's own behavior' would simply be one variable bearing on the court's choice among options"); *Bounds*, 71 Or App at 747-48 (officer's statements to a defendant during questioning that admitting conduct might be the best way to get help, and that there would be charges but the prosecutor was not going to "crucify" him, did "not amount to a promise of immunity from prosecution rendering the confession involuntary").

In the totality of the circumstances of this case, that distinction—the difference between a situation in which an officer suggests that the results of a prosecution may be more favorable to a defendant who admits what occurred and a situation in which an officer suggests that no prosecution will be commenced if the defendant admits what occurred—is dispositive. The trial court correctly determined that defendant's statements to Perkins were voluntary and, consequently, did not err in denying suppression of those statements.

OBJECTION TO THE PROSECUTOR'S CLOSING
ARGUMENT AND MOTION FOR MISTRIAL

We proceed to defendant's second assignment of
error, pertaining to the denial of his motion for a mistrial,
which was based on comments by the prosecutor in closing
argument, which, defendant contends, impermissibly shifted
the burden of proof and improperly referred to facts not in
evidence. The procedural circumstances are undisputed.

As noted, 269 Or App at 625, after M made the ini-
tial disclosures of alleged abuse, she was interviewed at the
STAR Center. At trial, the state's case consisted primarily
of recorded evidence of the pretext call and Perkins's inter-
view of defendant, as well as testimony by M. In his opening
statement, the prosecutor told the jury that the recording of
M's interview at the STAR Center would be in evidence.

During the state's case-in-chief, Perkins testified that
the interview had been recorded. However, the STAR Center
interview recording was never introduced into evidence. Rather,
at trial, defense counsel raised a concern that the recording
was inadmissible hearsay, because the state failed to give ade-
quate notice of M's statements pursuant to OEC 803(18a)(b).
In response, the prosecutor suggested that the recording was
likely to become admissible as containing prior consistent
statements if defense counsel chose to cross-examine M at trial
about the disclosures—and, thus, that the court did not need
to rule about the admissibility of the recording as hearsay at
that point. The trial court rendered no ruling.

The state did not thereafter seek to introduce the
STAR Center interview recording, and defense counsel ulti-
mately did not cross-examine M about the disclosures. Thus,
although the jury knew, from the state's opening statement
and Perkins's testimony, that the interview occurred and
had been recorded, the STAR Center recording itself was
never introduced into evidence.

During closing argument, and without the STAR
Center interview recording being in evidence, the prosecu-
tor made the following statements to the jury:

"I want to talk to you about credibility and what was
said and what was done.

> "[M] took the stand, looked you all in the eye and told you what happened. The defendant, sitting at that table over there, ably represented, how many questions did the defendant ask [M] about the details of the sex abuse? He asked about maybe she was mad at her dad because he spied on her. Not a single question did they ask about the touching or the details of the touching. Not one. *And you can rest assured that if there would've been a discrepancy between what [M] told you today, or yesterday, and what she told the STAR interview that was recorded, you would * * *.*"

(Emphasis added.) Defense counsel immediately objected and, with the jury excluded, amplified the objection:

> "A couple of things, Your Honor. That is burden shifting. I don't have to ask her any questions, I don't have to ask witness[es] anything. The prosecution is not allowed to shift the burden on to [defendant] or me to do anything, and that's just what he did right there. You can—if there was anything, any discrepancies he would have brought it up. First objection.
>
> "Second objection is earlier in the case, [the prosecutor] said well [the defense] better not talk about that STAR Center interview. He got it excluded; he kept it out of evidence, so he better not bring up the STAR Center interview. I said, of course, I don't want to talk about the STAR Center interview, that's the whole reason that I moved to have it suppressed and that's the whole reason that it was suppressed. Um, there's a million reasons why that STAR interview, STAR Center interview, could be suppressed. There was discrepancies between what was said at the STAR Center interview and what she said on the stand. There was discrepancies between what she told the police and—there were a lot of discrepancies. But whether or not I choose to bring those up is entirely up to me; he can't shift that burden onto me and he can't talk about evidence that Your Honor excluded, and he can't talk about it in closing."

Defendant moved for a mistrial at that point. The trial court observed that it had not ruled that the STAR Center recording was inadmissible, and defense counsel, while acknowledging that that was correct, remonstrated that the recording had not been received into evidence and that parties could not argue about things not received into evidence:

"[It] was never received into evidence. When something's not received into evidence how do you—you don't get to argue about it. What we get to argue about is the evidence that's been received and is before the jury. It's not in evidence * * *."

The court noted that there had been testimony that a recording had been made of the victim's interview at the STAR Center. The prosecutor argued that defense counsel "made a tactical decision not to use it. I'm—I can comment on that."

The trial court denied defendant's motion for a mistrial. After the court so ruled, the prosecutor, in continuing his closing argument, did not complete the comment that was interrupted by defendant's objection. The prosecutor did, however, later state to the jury, when discussing testimony by defense witnesses who did not believe that defendant had committed the alleged crimes, that these witnesses had formed their opinions without having seen the STAR Center recording.[2] Ultimately, the jury found defendant guilty of two counts of first-degree sexual abuse (Counts 4 and 6) and one count of second-degree sodomy (Count 5), and acquitted defendant on the remaining three counts of first-degree sexual abuse.

On appeal, defendant contends that the trial court abused its discretion in denying the motion for a mistrial, relying on *State v. Wederski*, 230 Or 57, 368 P2d 393 (1962). The state counters that *Wederski* is materially distinguishable and that the circumstances here are more akin to those in *State v. Lincoln*, 250 Or 426, 443 P2d 178 (1968), *State v. Galloway*, 202 Or App 613, 620-21, 123 P3d 352 (2005), *vac'd on other grounds*, 345 Or 315, 135 P3d 62 (2008), and *State v. Henderson*, 242 Or App 357, 364-65, 255 P3d 661, *rev den*, 350 Or 571 (2011), in which either the Supreme Court or we affirmed the denial of motions for mistrial that were based on a prosecutor's reference to a defendant's failure to present certain evidence.

---

[2] The prosecutor had, in fact, played portions of the other recordings that were admitted into evidence for these defense witnesses to hear, but the witnesses had not altered their testimony that they did not believe defendant committed the charged offenses.

The resolution is hardly clear-cut, because—as will become apparent as we recount them—neither *Wederski* nor any of the cases that the state invokes is precisely analogous. In *Wederski,* the defendant was charged with having committed a burglary in which, *inter alia,* 100 blank checks had been stolen. Later, several of the checks were forged. 230 Or at 59. At trial, those checks were admitted into evidence, and one of the defendant's alleged accomplices testified that they bore the defendant's handwriting. *Id.* During the defense closing argument, defense counsel emphasized that the state had not presented expert testimony substantiating that the handwriting was, in fact, the defendant's. *Id.* at 59-60. The prosecutor then responded in rebuttal closing:

> "As to why we don't have a handwriting expert used in the trial, [defense counsel] did bring that up, and it requires some comment I am sure.
>
> "You know that there are certain rules of evidence and certain requirements before we can use an expert witness. Mr. Clair Alderson, if any of you are familiar, sat through the entire trial and the right situation didn't present itself so that we could get his testimony on. You recall there was no denial by [the defendant] that that was his handwriting or perhaps we might have used our expert witness."

*Id.* at 60. Defense counsel unsuccessfully moved for a mistrial, asserting that the prosecutor's reference had "improperly (1) invited the jury to consider what a state's witness might have testified had he been called, and (2) at least indirectly commented upon the defendant's failure to take the stand." *Id.* The trial court denied that motion, and the jury convicted the defendant.

The Supreme Court reversed and remanded, holding that the trial court had erred in denying the mistrial motion:

> "Had [the court given a suitable curative instruction], the presumably harmful effect of the district attorney's remarks might have been removed and the denial of the motion for a mistrial might well have been within the permissible limits of discretion. The instructions, however, *failed to caution the jury that they could not consider the presence in the courtroom of silent witnesses in aid of the*

*state's case. Neither did the court instruct the jury that the defendant had no duty to prove or disprove anything; that* his plea of not guilty denied everything; *and that the jury could draw no inferences from the defendant's failure to contradict any evidence in the case.* As the court failed to admonish the jury to disregard the improper argument of the district attorney, the case went to the jury with the prejudicial statements approved, so far as the jury knew, by the court's silence."

*Id.* at 60-61 (emphasis added). In rejecting the state's arguments that the error was harmless, the Supreme Court observed:

"The state's reference to evidence it might have produced, but did not, was an open invitation for the jury to speculate in a manner which has been denounced by this court on several occasions. The state's reference to the defendant's failure to deny the forgeries, innocently though it may have been intended, could not have gone unnoticed by a jury which had waited in vain through two days of trial for the defendant to take the stand so they could hear what he had to say about the case. Article I, § 12, of the Oregon Constitution guarantees the privilege of the defendant to remain silent. The privilege is meaningless if the state may refer to the defendant's silence with impunity."

*Id.* at 61-62 (citations omitted).

Thus, the prosecution in *Wederski* both invited the jury to rely on facts not in evidence that purportedly would have bolstered the state's case (*viz.*, Alderson's putative expert testimony) and referred to the defense's failure to offer controverting evidence—in the form of the defendant's own testimony. With respect to the latter, the Supreme Court referred to the trial court's failure to give a cautionary instruction that the jury *"could draw no inferences from the defendant's failure to contradict any evidence in the case." Id.* at 61 (emphasis added).[3]

---

[3] *See also State v. Macomber*, 18 Or App 163, 169-70, 524 P2d 574 (1974) (prosecutor's comments in closing argument urging the jury to "ask [the defendant] to explain various things" impermissibly commented on the accused's silence, contrary to *Wederski*, but trial court's curative instruction remedied that conduct so that "such harm as there was in the remarks was removed").

Read literally, that emphasized proposition could be understood to preclude prosecutors from ever commenting on a defendant's failure to present controverting evidence (beyond the obvious preclusion of commenting on the defendant's silence). However, *Lincoln*, *Galloway*, and *Henderson* demonstrate that there is no such categorical preclusion.

In *Lincoln*, the defendant was charged with the burglary of a service station, and, at trial, the state called some, but not all, of the police officers involved in the arrest and investigation; some of the officers not called were in the courtroom for trial. 250 Or at 427. In closing, defense counsel argued to the jury that "the state had not disclosed all of the information it possessed because all of the officers with knowledge of the investigation were not called as witnesses." *Id*. In rebuttal, the prosecutor rejoined, "Counsel knows if he wants to call any officers in the courtroom, he certainly can do that." *Id*. The defendant moved for a mistrial, which was denied, and the Supreme Court affirmed:

> "It is clear that the comment in question in no way related to defendant's failure to take the witness stand. *There is no rule which prevents the state from commenting on defendant's failure to call witnesses other than the defendant which were available to him.*"

*Id*. (emphasis added). In sum, in the context of responding to defense counsel's statements to the jury that the prosecution had not offered testimony from certain witnesses, the court concluded that the state was not precluded from noting that defendant had the ability to call those witnesses.

The emphasized portion of the statement in *Lincoln*, viewed in isolation, could be understood to be in tension with the similarly categorical proposition from *Wederski* quoted above: If the jury cannot draw inferences from "the defendant's failure to controvert any evidence in the case," then why or how can the state comment on a defendant's failure to present such controverting evidence? *Lincoln* does not refer to *Wederski*. The resolution, we believe, lies in the meaning of the use of "the defendant" in *Wederski*. If "the defendant" is understood to connote, generically, "the defense," then *Wederski* and *Lincoln* are, indeed, incompatible. If, however, that reference in *Wederski* to "the defendant" meant

the defendant *personally*—that is, that the jury can draw no inferences from the defendant's failure to controvert the state's proof by way of his or her own testimony—then the cases are not necessarily inconsistent. Given the context of *Wederski*, and subject to the amplification we offer below, we believe that the latter understanding is correct.

*Galloway*—which relied on *Lincoln* and distinguished *Wederski*—comports with that understanding. There, the defendant was charged with a variety of serious offenses related to "two fire-setting incidents." 202 Or App at 615. The evidence at trial included testimony from a jail deputy that, after the defendant had been taken into custody, the deputy had heard another inmate ask the defendant if he had an alibi, and the defendant had replied, "I told my girlfriend what to say to the cops." *Id.* at 616. Apparently in reference to that testimony, in closing argument, the prosecutor commented, "In this trial, you folks haven't heard a single thing about alibi." *Id.* at 620. Defense counsel subsequently unsuccessfully moved for a mistrial, and we affirmed:

> "We find *Wederski* to be inapplicable here. In that case, the prosecutor referred specifically to the defendant's failure to deny the handwriting as his own. The prosecutor's arguments to the jurors in the present case that they had heard no testimony regarding alibi was not a comment on defendant's decision to remain silent, but rather to alert the jury that the defense had not put on *any* evidence regarding an alibi. 'There is no rule which prevents the state from commenting on defendant's failure to call witnesses other than the defendant which were available to him.' [*Lincoln*, 250 Or at 427.] Moreover, the court instructed the jury in this case not to place any weight on defendant's decision not to testify. The trial court did not err in denying defendant's motion for mistrial."

*Id.* (emphasis in original).

Thus, in *Galloway*, in the context of responding to evidence concerning a possible alibi, the prosecutor was not precluded from commenting on the defense's failure to present the putative alibi witness. *See also State v. Wright*, 12 Or App 73, 77-78, 504 P2d 1065 (1973) (affirming denial of mistrial based on prosecutor's comment relating to the

defendant's failure to call a witness in support of his alibi defense); *State v. Goodin*, 8 Or App 15, 23, 492 P2d 287 (1972) (affirming denial of mistrial based on prosecutor's comment that the defendant had failed to call a witness who had been brought from the state penitentiary to testify at the defendant's request).

Finally, in *Henderson*, the defendant, who was charged with murder, raised a defense of extreme emotional disturbance, on which he bore the burden of proof. ORS 163.135(1). The focus in that case was on the defendant's state of mind when he crashed a vehicle into the wall of his garage, killing his wife. *Henderson*, 242 Or App at 359. Defense counsel cross-examined an investigating officer, Burdick, about damage to the garage wall, eliciting testimony that Burdick had not taken certain measurements. On redirect, the prosecutor elicited further testimony from Burdick that neither the state nor the defense had asked the officer to take such measurements. Defendant objected and moved for a mistrial, arguing that the question improperly shifted the burden to gather evidence onto defendant. *Id.* at 363.

The trial court denied the motion, noting that, in light of the defense burden to establish the extreme emotional disturbance defense "and given that by its questions of this [witness] it has suggested that there would be evidence available that is not otherwise available due to the inadequacies of the state's investigation, this court considers it to be appropriate rebuttal." *Id.*

On appeal, referring to both *Lincoln* and *Galloway*, we affirmed. We concluded:

> "Although *Lincoln* involved a prosecutor's comment on a defendant's ability to call witnesses, its reasoning applies equally to the issue in this case, that is, defendant's ability to procure the measurements of the damage to the garage wall that was caused by his vehicle. The prosecutor's question to Burdick on redirect examination * * * alerted the jury to the fact that defendant could have procured the evidence that defendant had faulted the police for not gathering. The prosecutor was entitled to rebut defendant's implication that the state had failed to gather potentially exculpatory evidence because the investigating officers had

jumped to the conclusion that defendant had intentionally murdered the victim. The prosecutor's narrow question to Burdick directly rebutted that implication."

*Id.*

*Wederski* and *Lincoln* and their progeny are not easily susceptible to principled extension and application, not the least because the baseline precedents simply announced categorical propositions without circumstantial nuance or limitation. Further, there are material procedural variations among the cases. Still, upon careful consideration of those cases, we conclude that they reasonably yield several not-inconsistent principles.

*First,* one fundamental aspect of *Wederski* is not qualified by any of the subsequent case law: The prosecutor cannot either implicitly or explicitly invite the factfinder to consider nonadmitted evidence "in aid of the state's case." *Wederski*, 230 Or at 61. That is, to the extent that the prosecution either fails to, or is unable to, present testimony (*e.g.,* the handwriting expert, Alderson, in *Wederski*) or other evidence, the prosecutor cannot refer to such putative evidence in an effort to bolster the state's case.

*Second,* another fundamental principle of *Wederski* is that, in most circumstances, *see* 269 Or App at 642 n 6, references to the defendant's silence or failure to testify are impermissible.

*Third,* read in light of *Lincoln* and its progeny, *Wederski* limits the circumstances in which a prosecutor can comment on the defendant's failure to present or contradict evidence, but does not categorically prohibit such comments. In *Wederski*, the court recognized that certain comments about a defendant's failure to present evidence may reasonably cause the factfinder to misapprehend and misallocate the burden of proof.[4] However, a wholesale prohibition on all

---

[4] For examples of other impermissible prosecutorial argument pertaining to the burden of proof, *see, e.g., State v. Sanchez-Jacobo*, 250 Or App 621, 632-35, 282 P3d 880 (2012), *rev den*, 353 Or 280 (2013) (prosecutor began closing argument with the statement "at this point in trial, the presumption of innocence will evaporate"); *State v. Worth*, 231 Or App 69, 72-73, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010) (the prosecutor made several statements to the effect that "the presumption of innocence is over").

such comments would unfairly impair prosecutors' ability to counter certain matters raised or implicated by the defense. Thus, when the defense raises matters, such as alibi as in *Galloway* or *Wright*, on which, as a practical matter, the defendant bears the initial burden of production, but fails to present any evidence, the prosecution can comment on that deficiency. Similarly, when an affirmative defense has been raised, as in *Henderson*, the prosecutor is permitted to respond, by commenting on a defendant's failure to meet the burden of production or persuasion.[5]

Further, it is clear from *Lincoln* and *Henderson* that, when the defense makes an argument that the state has failed to present certain evidence—with the implication that such evidence would have supported the defense or undermined the state's case—the prosecutor can respond by noting that the defense has the ability to produce it. That principle, indeed, is the obverse of the first principle derived from *Wederski* noted above: Just as the prosecutor cannot invite the factfinder to consider nonadmitted evidence in aid of the state's case, if defense counsel invites the factfinder to consider nonadmitted evidence as undermining the state's case, the prosecutor is entitled to respond, again, so long as that response comports with the proper allocation of the burden of proof.[6]

We turn to the application of those principles in this case. Here, the prosecutor's comment—"And you can rest

---

[5] When an affirmative defense is raised, the defendant bears the burden of proof on that defense by a preponderance of the evidence. *See* ORS 161.055(2). With respect to other defenses, including alibi defenses, the state bears the burden of disproving them beyond a reasonable doubt. ORS 161.055(1). However, even if the state bears the burden of proof to disprove a defense, it nonetheless must be raised by the defendant, either by notice in writing by the defendant before trial, or by way of evidence presented at trial. ORS 161.055(3).

[6] Of course, as we know from *Wederski*, the prosecutor nonetheless generally cannot respond by commenting on the defendant's failure to testify or an invocation of the right to remain silent. 230 Or at 60. *Compare State v. Guritz*, 134 Or App 262, 268-69, 894 P2d 1235, *rev den*, 321 Or 560 (1995) (defense counsel "opened the door" to comment about the defendant's termination of police interview by invocation of his right to remain silent by "criticizing the lack of depth of the interview"), *with State v. Reineke*, 266 Or App 299, 309, 337 P3d 941 (2014) ("[E]ven if a defendant opens the door to evidence of the defendant's silence, a prosecutor cannot argue that the defendant is guilty because he or she invoked the right to remain silent.").

assured that if there would have been a discrepancy between what [M] told you today or yesterday, and what she told the STAR interview, that was recorded, you'd * * *"—referred to defendant's failure to present potentially controverting evidence that the complainant had made prior inconsistent statements. An implication—perhaps an inescapable implication—is that M's account had remained consistent throughout. The question thus narrows: Was the prosecutor's statement an impermissible comment under the first *Wederski* principle described above, or a permissible one under the third principle, as derived from the *Lincoln* line of cases?

We conclude that the prosecutor's remarks violated the first principle and did not comport with the third. As described above, the prosecutor referred to the STAR Center recording in his opening statement, but then, after defendant raised the potential inadmissibility of the recording because of an inadequate OEC 803(18a)(b) notice, the state discontinued its efforts to offer the recording into evidence. Most significantly, at no point did defense counsel *ever* argue about the STAR Center recording to the jury, or suggest in any way that it would have undermined the state's case or enhanced the defense.[7]

Given those circumstances, we conclude that the prosecutor's reference to the STAR Center recording was not fair comment in response to a defense argument as to the state's purported failure to present certain evidence; nor was it a permissible comment on the defense's failure to present certain evidence on a matter on which defendant bore the initial burden of production or the ultimate burden of proof. Rather, the remarks here were analogous to the prosecutor's reference to the nontestifying handwriting analyst in the courtroom in *Wederski*: It was "an open invitation for the jury to speculate," *Wederski*, 230 Or at 60, that unadmitted evidence was favorable to the state as confirming

---

[7] In fact, after defendant objected to the admission of the interview recording and the prosecutor agreed not to offer it in evidence, *see* 269 Or App at 633, the prosecutor told the court, "If in argument defense counsel says [']where's the tape[?'], that would be a serious problem." Defense counsel agreed that he would not do that, and the court stated that, if defense counsel "raises that in argument[,] I'll give the jury an instruction that [defense counsel] objected to the admission of the tape."

the historical consistency of the complainant's accounts. Further, as in *Wederski*, the trial court here "failed to caution the jury that they could not consider the presence in the courtroom of silent witnesses in aid of the state's case." *Id.* at 61.[8] Accordingly, the trial court erred in overruling defendant's objection to the prosecutor's remarks.

Our inquiry reduces to whether, given that error, coupled with the failure to give any curative instruction of the sort mandated by *Wederski*, the trial court was obligated to grant the motion for mistrial. Or, more precisely, with reference to the applicable standard of review, did the trial court's denial of a mistrial in these circumstances constitute an abuse of discretion? *See, e.g., State v. Worth*, 231 Or App 69, 74, 218 P3d 166 (2009), *rev den*, 347 Or 718 (2010) ("We review a trial court's decision to deny a mistrial due to a prosecutor's conduct for abuse of discretion."). The touchstone of the trial court's discretion, and of our review, is an assessment of the likelihood that the prosecutor's uncorrected comments so affected the jury's consideration as to "deny [defendant] a fair trial." *State v. Davis*, 345 Or 551, 583, 201 P3d 185 (2008); *see also State v. Farokhrany*, 259 Or App 132, 137-38, 312 P3d 584 (2013) ("If an objectionable remark, properly challenged, is likely to influence the jury, the trial court's failure to correct it may be a ground for reversal.").

Here, the state's *only* harmless error argument is that the jury was properly instructed not to draw a negative inference from defendant's failure to testify and to base its verdicts on the evidence, and that the lawyers' statements were not evidence.[9] The jury was also properly instructed

---

[8] Given the trial court's overruling of defendant's objection to the prosecutor's comment, it was not incumbent on defense counsel to seek a curative instruction, because such a request would have been futile. *See Worth*, 231 Or App 77 n 4 ("Here, given the court's ruling that the prosecutor's *** statements constituted permissible argument, we conclude that a request for further curative instructions would have been futile.").

[9] The state does not argue that the evidence of defendant's purported guilt, including his broadly inculpatory statements during the pretext call and during the police interview, was so overwhelming as to render the prosecutor's comments harmless. In that regard, we note that the jury acquitted defendant on three counts (each charging first-degree sexual abuse), that defendant was convicted by 10-2 verdicts on the remaining counts, and that that result was reached only after the jury twice attempted to return a verdict that revealed that, in fact, there was significant disagreement on the jury as to most of the counts.

on the burden of proof and that it needed to determine guilt beyond a reasonable doubt. We are unpersuaded that such generic instructions meaningfully remedied the prejudicial impact of the prosecutor's comments. Specifically, nothing in the generic instructions given by the court in this case addressed the problem of the jury being invited—without contradiction from the court—to speculate on, and draw inferences negative to the defense about, the contents of the STAR Center recording. That is, the jury instructions here did not mitigate the "presumably harmful effect" of the prosecutor's statements. *Accord Worth*, 231 Or App at 79 (noting that "[t]he overruling of [the defendant's] objection gave the jury reason to think that the prosecutor's statement was, in fact, a correct statement of the law" and concluding that the trial court's generic instructions as to the presumption of innocence "did not provide guidance as to the longevity of the presumption of innocence, such as to remove confusion about whether the presumption of innocence extended through jury deliberations").

Nor did the prosecutor's improper argument pertain to some incidental or collateral matter. Rather, the complainant's credibility, including with respect to the accuracy of her account as to the timing of certain events—which was material to whether she was under 14 at the time of each of the charged offenses, as charged in each count—was critical to the prosecution's case.[10] The prosecutor's effort to bolster the complainant's credibility by reference to the unadmitted evidence, as implicitly confirming the consistency of the complainant's account, bore directly on that issue. *Compare State v. Moller*, 217 Or App 49, 174 P3d 1063 (2007) (erroneously admitted evidence of the defendant's refusal to consent to a search was not harmless "in light of the fact that it was central to the state's case and in light of the close jury vote by which he was convicted"), *with State v. Dalby*, 251 Or App 674, 284 P3d 585 (2012), *rev den*, 353 Or 209 (2013) (testimony was erroneously admitted that the defendant

---

[10] Although defendant, in the police interview, acknowledged that certain sexual contacts with the complainant had occurred, he indicated that he believed they occurred when the complainant was 14 or 15 years old. The complainant, for her part, testified that incidents of abuse had occurred over a significantly longer time period.

had invoked his right to counsel, but the error was harmless because it had little to do with the only seriously disputed factual issue in the case). Finally, the prejudicial impact of the error was compounded by the prosecutor's additional reference to the unadmitted STAR Center recording when, in closing argument, the prosecutor stated that certain witnesses who testified on defendant's behalf had never seen the STAR Center recording. *See* 269 Or App at 635, necessarily implying that, if they had, the content of the recording would have altered their testimony.

Given the totality of the foregoing circumstances, we conclude that "the effect of the prosecutor's conduct was to deny [defendant] a fair trial." *Davis*, 345 Or at 583. Accordingly, the trial court erred in denying defendant's motion for mistrial.

Convictions on Counts 4, 5, and 6 reversed and remanded; otherwise affirmed.