Johnson, J.,
dissenting: I agree with the majority’s reversal of the capital murder conviction under Count III, which included the *343 killing of Izabela Lewicka; but I dissent from the majority’s determination that the State proved capital murder, as the prosecutor chose to charge it, in Count II of the complaint. The prosecutor has the duty to prepare a charging document that actually describes a valid crime and then the State must prove all of the elements of the charged crime beyond a reasonable doubt. From a legal, factual, or logical viewpoint, one simply cannot say that those duties were fulfilled in this case. This court should not provide cover for a prosecutor’s charging mistakes in any case, much less a death penalty case. Accordingly, both capital murder convictions should be set aside, along with both corresponding sentences of death.
The majority jumps the rails at the start of its journey by describing the capital murder charges as follows: “The State charged Robinson with two counts of capital murder, one count for the intentional, premeditated murder of Suzette Marie Trouten (Count II) and the other for the intentional, premeditated murder of Izabela Lewicka (Count III).” Slip op. at 18. It dren recites that “tíre murders of Trouten and Lewicka were, each part of a common scheme or course of conduct that also included the intentional, premeditated murders of Beverly J. Bonner, Sheila Faith, Debbie Faith and Lisa Stasi.” Slip op. at 18. The majority is apparently implying that the defendant was guilty of the capital murder of Trouten and the capital murder of Lewicka and that the murders of the four other women simply served as proof of a common scheme or course of conduct. Later, the majority refers to Trouten and Le-wicka as the “principal capital murder victims,” declaring that their killings completed the elements of capital murder in each count. Slip op. at 237-38. Although the majority’s characterization of the capital murder charges comports with a fair reading of the State’s complaint, it is not supported by the plain language of the capital murder statute. See K.S.A. 21-3439(a)(6).
I begin with the statutory definition of the precise crime for which the defendant was purportedly charged, convicted, and sentenced to death. That starting point is critical because it is a legislative function to define crimes. See State v. Bolin, 200 Kan. 369, 370, 436 P.2d 978 (1968) (“Generally speaking, of course, it is within the power of the legislature to define what acts shall consti *344 tute crimes.”)- Neither an executive branch prosecutor, nor a judicial branch appellate court, has the authority to redefine the acts that constitute a legislatively created crime. Here, the relevant part of the applicable statutory language states: “(a) Capital murder is the: ... (6) intentional and premeditated killing of more than one person as a part of the same act or transaction or in two or more acts or transactions connected together or constituting parts of a common scheme or course of conduct.” K.S.A. 21-3439(a)(6). Hereafter, I will discuss that statute as it relates to the one count of capital murder that the majority affirmed, albeit the discussion would apply equally to the manner in which the State charged the other capital murder count.
Given its collective experience discerning the plain language of statutes, what should jump out at the majority is that, first and foremost, the crime requires tire State to prove “the killing of more than one person.” Pointedly, the legislature did not say that capital murder is the tolling of one person after having previously tolled one or more other persons. It did not say that capital murder is the tolling of one person as part of a common scheme or course of conduct involving the tolling of others. Rather, the legislature said that tire State must prove that the defendant tolled at least two persons, and the crime-defining statute makes absolutely no qualitative distinction between those two or more victims. In other words, proof of tire intentional, premeditated murder of each and every victim is a required essential element of the charged crime of capital murder equal in importance to every other element. As the prosecutor charged Count II, tire States burden to prove that the defendant tolled Bonner, the Faiths, and/or Stasi was no less (or no more) tiran its burden to prove defendant tolled Trouten. Consequently, the designation of Trouten as a “principal capital murder victim” is a phantom concept, manufactured by the State s charging document and perpetuated here by the majority, but totally devoid of any legal support.
Granted, a complaint “drawn in the language of the statute[] shall be deemed sufficient.” K.S.A. 22-3201(b). And here, the prosecutor incorporated most of the statutory words into the complaint, albeit not in the same order as set forth in the statute. Neverthe *345 less, in this case, the most damning aspect of the mischaracterization of capital murder as the killing of one person after engaging in a course of conduct of killing others is that it permits the majority to divine a new theory whereby the State is permitted to execute a defendant for a murder that occurred before there was a death penalty in this State.
The rule of law has always been that the district court must sentence a person within the maximum punishment allowable by the law in effect when that person committed the crime for which sentence is being imposed. See Cooper v. Werholtz, 277 Kan. 250, Syl. ¶ 1, 83 P.3d 1212 (2004) (“Criminal statutes and penalties in effect at the time of the criminal act are controlling.”). Likewise, as the majority acknowledges, a statute will operate prospectively in the absence of clear language that it is intended to operate retroactively, and K.S.A. 21-3439 lacks such clear retroactive language. Moreover, the Ex Post Facto Clause of the United States Constitution “is aimed at laws that ‘retroactively alter the definition of crimes or increase the punishment for criminal acts.’ [Collins v. Youngblood, 497 U.S. 37,] at 43 (citing Colder v. Bull, 3 Dali. 386, 391-392 (1798) (opinion of Chase, J.); Beazell v. Ohio, 269 U.S. 167, 169-170 (1925)).” (Emphasis added.) California Dept. of Corrections v. Morales, 514 U.S. 499, 504-05, 115 S. Ct. 1597, 131 L. Ed. 2d 588 (1995). Here, the majority retroactively alters the definition of the crimes Robinson committed prior to the July 1, 1994, enactment of capital murder and increases his punishment for those crimes.
In this case, when defendant killed Bonner, the Faiths, and Sta-si, the maximum penalty for those murders was life in prison. Indeed, in this very case, the district court sentenced the defendant to a hard 15 fife sentence for the killing of Stasi. But the majority vacated that sentence in favor of a death sentence. Given that all of the elements of Stasi’s intentional, premeditated murder had to be proved in order to fulfill the elements of tire capital murder charge, the previously completed intentional, premeditated murder of Stasi was a lesser included offense of the charged capital murder. See K.S.A. 21-3107(2)(b) (“A lesser included crime is: ... a crime where all elements of the lesser crime are identical to some of the elements of tire crime charged.”). And a person “may be *346 convicted of either the crime charged or a lesser included crime, but not both.” K.S.A. 21-3107(2). But permitting the State to use a predeath penalty murder to fulfill tire capital murder requirement of two or more Idllings effectively alters tire definition of the prior murders and increases the penalty for the previously completed “lesser included offense” murders from fife in prison to death.
To rationalize the retroactive application of the death penalty to murders that pre-dated the legislative authority to impose that draconian penalty, the majority fashions a completed-crime theory of prosecution, whereby a murder completed years earlier is subsequently utilized as an element of a capital murder that is “completed” after the fact by adding a new killing. Pointedly, the majority cites to no Kansas case that has permitted such a pioy in any context, much less a capital case. Instead, curiously, the majority points to a statute of limitations statutory provision, K.S.A. 21-3106(6), as direct authority for converting a previously completed crime into an element of a newly defined, more serious crime. The majority’s manufactured rationale is flawed.
First, the statutory provision forming the foundation of the majority’s theory is a subsection of a statute that is entitled “Time limitations for commencement of prosecutions.” K.S.A. 21-3106. In other words, the majority’s magical provision declaring that an offense is committed when every element occurs is direct authority only when a court is determining whether the time limit for prosecuting an offense has expired. But K.S.A. 21-3106(1) states unequivocally that “[a] prosecution for murder . . . may be commenced at any time.” (Emphasis added.) Thus, we have no need to ruminate on when the current capital murder was committed for statute of limitation purposes because there is no statutory time limitation on prosecuting capital murder. Quite simply, then, K.S.A. 21-3106(6) is not applicable here.
Perhaps the majority intended to apply the statute of limitations provision by analogy, i.e., as persuasive support for its “completed crime” theory of retroactively imposing the death sentence. If so, I submit that a statutory provision that is facially more analogous to the determination of which crime is applicable is found in K.S.A. 21-3102(4), which addressed the scope and application of the Kan *347 sas Criminal Code that was effective July 1, 1970. The provision states:
“This code has no application to crimes committed prior to its effective date. A crime is committed prior to the effective date of the code if any of the essential elements of the crime as then defined occurred before that date. Prosecutions for prior crimes shall be governed, prosecuted and punished under the laws existing at the time such crimes were committed.” K.S.A. 21-3102(4).
Granted, this court has construed that provision to be applicable only to the adoption of the entire new criminal code rather than applying to any subsequent amendments to crimes within the code. State v. Noah, 246 Kan. 291, 293, 788 P.2d 257 (1990) (K.S.A. 21-3102[4] refers to crimes committed prior to July 1, 1970, effective date of new criminal code). Nevertheless, it is no less persuasive as to how the law should be applied than the majority’s statute of limitations provision. Having completed first-degree premeditated murder before the existence of capital murder, the prosecution for that prior murder should, intuitively as well as logically, be governed under the laws existing at the time such crime was committed. That paradigm comports with the long-standing rule that courts are to impose the punishment that was in effect when the crime was committed and precludes the punishment-increasing gamesmanship displayed here.
Next, even accepting that K.S.A. 21-3106(6) might have something to do with the question presented to us in this case, it actually confirms that tire murders of Bonner, the Faiths, and Stasi should be deemed “committed” before the adoption of the death penalty. Every element of first-degree premeditated murder had “occurred” before the adoption of capital murder. And to the extent that the majority contends that the prior killings had not fulfilled their role as its purported “second element” of capital murder prior to Trouten s murder, the opinion contradicts itself.
The majority describes that “second element” as a requirement that “these killings be part of the same act or transaction or multiple acts or transactions connected together or constituting parts of a common scheme or course of conduct.” Slip op. at 237. But previously, in discussing the sufficiency of the evidence, the majority asserted drat there was enough evidence that “the jurors could have found that all of the murders were related to one another in *348 some way and therefore part of a common scheme or course of conduct.” (Emphasis added.) Slip op. at 235. If it were true that all of the murders were sufficient evidence of the second element, then all of the statutory elements of capital murder had occurred before the defendant killed Trouten. The defendant had killed more than one person as part of the same act or transaction (the Faiths) or as parts of a common scheme or course of conduct (Bonner, the Faiths, and Stasi), completing all of tire statutory elements of capital murder before it was statutorily enacted. Contrary to the majority’s declaration, the murder of Trouten was unnecessary to complete the elements of capital murder. Rather, tire Trouten murder added nothing to the State’s theory of prosecution, except to use its occurrence date to invoke the death penalty and thereby increase the punishment for the previously completed crimes. In my view, this is a blatant example of ex post facto jurisprudence.
To bolster its contention that the State can increase the penalty for a completed first-degree premeditated murder, i.e., after the murder has been “committed,” the majority resorts to cases from foreign jurisdictions that are not on point. As the majority points out, the crime involved in State v. Zelinka, 130 Or. App. 464, 472, 882 P.2d 624 (1994)—murder by abuse and criminal mistreatment—required proof that the defendant murdered the victim by abuse after having previously assaulted or tortured the victim or another child. Slip op. at 237-38. Allowing tire previous assaults or torture to occur before enactment of the murder by abuse statute might have been an analog here if capital murder was defined as the intentional, premeditated murder of one person, after having previously murdered others. But as discussed above, that is not how our statute defines capital murder.
Likewise, the crime involved in People v. Grant, 20 Cal. 4th 150, 83 Cal. Rptr. 2d 295, 973 P.2d 72 (1999), was a violation of a continuous sexual abuse of a minor statute, whereby the defendant had to molest the child three times during a period of not less than 3 months. See Slip op. at 239. Where a statute requires continuous conduct over a specified time period, it makes sense that the crime is not completed until the last act is committed. But capital murder can occur in one act or transaction, which presumably hap *349 pened when defendant killed both Sheila and Debbie Faith, thus completing all of the elements of the later-to-be-established crime of capital murder.
In that vein, the majority’s assertion that “the last act or event necessary to trigger application of K.S.A. 21-3439(a)(6) was the murder of Trouten” because she was killed after the enactment of capital murder skews the plain statutory language. Slip op. at 239. To belabor the point, the statute required “the killing of more than one person,” not the lulling of one person after having killed others. When the prosecutor included the killings of Bonner, the Faiths, and Stasi in the complaint, all of the elements of capital murder were effectively pled, without considering the killing of Trouten.
The majority rejects Robinson’s proffer of United States v. Husted, 545 F.3d 1240 (10th Cir. 2008), because the federal act applicable there used the word “travels” which did not apply to someone who had previously “traveled.” Slip op. at 240. Yet, our capital murder statute suggests the present tense when it defines the crime as “the killing of more than one person.” Like Husted, that language does not express an intent to apply to someone who has “killed” prior to die statute’s enactment. Rather, to commit capital murder under subsection (a)(6), I submit drat the defendant had to kill more than one person after the enactment of the capital murder statute in order to fulfill the indispensable initial actus reus of the crime.
Even if one is seduced by the majority’s interpretation of the capital murder statute, I contend that my present-tense interpretation is certainly a reasonable reading of the statute. In that circumstance, the rule of lenity “ ‘requires the court to interpret [the statute’s] meaning in favor of the accused.’” State v. Reese, 300 Kan. 650, 658, 333 P.3d 149 (2014) (quoting State v. Coman, 294 Kan. 84, 97, 273 P.3d 701 [2012]). That construction principle is even more compelling in a death penalty case, considering the following:
“ ‘[D]eath is a different kind of punishment from any other which may be imposed in this country. ... From the point of view of tire defendant, it is different in both its severity and its finality. From the point of view of society, the action of the sovereign in taking the life of one of its citizens also differs dramatically from any other legitimate state action. It is of vital importance to tire defendant and to the community that any decision to impose the death sentence be, and appear to be, *350 based on reason rather than caprice or emotion.’ Gardner v. Florida, 430 U.S. 349, 357-358 [1977] (opinion of STEVENS, J.).” Beck v. Alabama, 447 U.S. 625, 637-38, 100 S. Ct. 2382, 65 L. Ed. 2d 392 (1980).
The majority not only fails to employ the rule of lenity, it bends over backward to create a way to affirm the capital conviction. That tack baffles me, especially given that the State did not need to ask this court to retroactively apply the capital murder statute. Both Trouten and Lewicka were killed after the enactment of the capital murder statute. Consequently the prosecutor could have avoided the need to use preenactment killings to satisfy the “killing of more than one person” element of capital murder by simply charging the murders of Trouten and Lewicka in one capital count, i.e., alleging that Robinson killed both Trouten and Lewicka as part of a common scheme or course of conduct. Then, tire killings of Bonner, the Faiths, and Stasi could have been the subject of four separate counts of first-degree, premeditated murder without being vulnerable to a multiplicity or double jeopardy challenge. The reason for splitting the death-eligible murders into two separate counts of capital murder is not readily apparent. Obviously a death sentence can only be imposed once; the State’s drive to obtain two death sentences accomplished nothing beyond creating grist for the appeal mill.
In short, if the State is going to kill its own citizens, even those who commit heinous and unfathomable acts, it is not unreasonable to require that the State strictly comply with the laws that authorize the imposition of that ultimate punishment. Here, the prosecution did not strictly conform with the law, and it is this courts duty to throw a flag and call that foul. I would reverse the remaining capital murder conviction and remand for resentencing as a first-degree premeditated murder. That course of action would permit the first-degree premeditated murder conviction and accompanying life sentence for Stasis killing to be affirmed and would permit the defendant to be convicted for Lewicka’s killing, albeit for the lesser included offense of first-degree premeditated murder.
Even if the State could clear the “killing of more than one person” hurdle, I believe it stumbles in its attempt to tie the Trouten murder to the others to meet the majority’s “second element.” I *351 disagree with the majority’s emphasis on the cherry-picked, out-of-context phrase from State v. Harris, 284 Kan. 560, 572, 162 P.3d 28 (2007), to conclude that tire multiple killings only need to “’be related to one another in some way.’ ” Slip op. at 232, 233. Nevertheless, even using the majority’s liberal concept of nexus, Trouten’s murder does not fit. Stasi was apparently murdered for her child, Bonner for her divorce maintenance payments, tire Faiths for their Social Security benefit payments, and Lewicka to clear the way for a former paramour. The majority states no apparent motive for the Trouten killing. I do not believe that it is sufficient for some of the killer’s methods to be similar. The killings have to be related to one another, not the killers methods. I do not read the subsection as including serial, but completely separate, killings. Again, I would reverse the remaining capital murder conviction on evidentiary grounds.
Finally, although there are other aspects of the majority opinion with which I take exception, I see no reason for further argument here. I do, however, take the liberty of using this platform to echo the sentiments that Justices Breyer and Ginsburg expressed in their dissent in the recent case of Glossip v. Gross, 576 U.S. _, 135 S. Ct. 2726, 2755-77, 192 L. Ed. 2d 761 (2015) (Breyer, J., joined by Ginsburg, J., dissenting), in which they called for a reexamination of whether the death penalty, in and of itself, constitutes a legally prohibited cruel and unusual punishment under the Eighth Amendment to the United States Constitution. 135 S. Ct. at 2756. Notwithstanding the egregious nature of the crimes and the compelling evidence of guilt presented in this particular case, I believe it is time for this court to reexamine the constitutionality of the death penalty under § 9 of the Kansas Constitution Bill of Rights, which prohibits the infliction of “cruel or unusual punishment.”
The Glossip dissent opined that in 1976, when the United States Supreme Court upheld the death penalty, “the Court thought that the constitutional infirmities in the death penalty could be healed,” and it “delegated significant responsibility to the States to develop procedures that would protect against those constitutional problems.” 135 S. Ct. at 2755 (Breyer, J., dissenting). But “[ajlmost 40 *352 years of studies, surveys, and experience strongly indicate . . . that this effort has failed.” 135 S. Ct. at 2755 (Breyer, J., dissenting). The dissent related that the current administration of the death penalty “involves three fundamental constitutional defects: (1) serious unreliability, (2) arbitrariness in application, and (3) unconscionably long delays that undermine the death penalty’s penological purpose.” 135 S. Ct. at 2755-56 (Breyer, J., Assenting). Moreover, the dissent noted that, perhaps as a result of tírese constitutional defects in the death penalty, “most places within the United States have abandoned its use,” which malees the penalty “unusual.” 135 S. Ct. at 2756 (Breyer, J., dissenting).

Cruel—Lack of Reliability

On the first point, the dissent noted the obvious, i.e., that “tire finality of death” makes it a qualitatively different punishment that requires a heightened need for reliability. 135 S. Ct. at 2756 (Breyer, J., dissenting.) One cannot undo an execution. Yet, researchers have uncovered “convincing evidence that, in the past three decades, innocent people have been executed,” as well as striking evidence that the death penalty has been wrongly imposed. 135 S. Ct. at 2756 (Breyer, J., dissenting). As of the date of this years dissent in Glossip, “the number of exonerations in capital cases [had] risen to 115.” 135 S. Ct. at 2757 (Breyer, J., dissenting). And that only included exonerations in the sense that the defendant was granted “relief from all legal consequences of a capital conviction through a decision by a prosecutor, a Governor!,] or a court, after new evidence of die defendants innocence was discovered.” 135 S. Ct. at 2757 (Breyer, J., dissenting).
Interestingly, “exonerations occur far more frequently where capital convictions, rather than ordinary criminal convictions, are at issue.” 135 S. Ct. at 2757 (Breyer, J., dissenting). Courts or governors are 130 times more likely to exonerate a defendant where a death penalty is at issue and 9 times more likely where capital murder, rather than noncapital murder, is at issue. 135 S. Ct. at 2757 (Breyer, J., dissenting). Some researchers have opined that the disparity is at least partially explained by a “greater likelihood of an initial wrongful conviction” in a death penalty case, precipitated in *353 part because capital crimes are typically horrendous murders that generate an “intense community pressure on police, prosecutors, and jurors to secure a conviction.” 135 S. Ct. at 2757 (Breyer, J., dissenting). That pressure increases the probability of a wrongful conviction. Moreover, I would add my belief that the intense public pressure accompanying the case on appeal increases the likelihood that a wrongful capital conviction will be affirmed by a state Supreme Court.
Granted, there are other factors that explain the inordinate number of death penalty exonerations, one of which is the practice of death-qualification of the capital jury, i.e., no one can serve as a juror unless he or she is willing to impose the death penalty. Research has led to tire conclusion that ‘“[f]or over fifty years, empirical investigation has demonstrated that death qualification skews juries toward guilt and death.’”135 S. Ct. at 2758 (Rreyer, J., dissenting). Likewise, flawed forensic testimony, such as faulty hair analysis, has been used in a number of capital cases. In fight of all of the factors, “researchers estimate that about 4% of those sentenced to death are actually innocent.” 135 S. Ct. at 2758 (Breyer, J., dissenting).
If one expands the analysis beyond cases establishing actual innocence, the instances in which the law was not followed in capital cases is breathtaking. “Between 1973 and 1995, courts identified prejudicial errors in 68% of the capital cases before them.” 135 S. Ct. at 2759 (Breyer, J., dissenting). “In sum, there is significantly more research-based evidence today indicating that courts sentence to death individuals who may well be actually innocent or whose convictions (in the laws view) do not warrant the death penalty’s application.” 135 S. Ct. at 2759 (Breyer, J., dissenting).

Cruel—Arbitrariness

“The arbitrary imposition of punishment is the antithesis of the rule of law.” 135 S. Ct. at 2759 (Breyer, J., dissenting). “[Studies indicate that the factors that most clearly ought to affect application of the death penalty—namely, comparative egregiousness of the crime—often do not,” while “circumstances that ought not to affect application of the death penalty, such as race, gender, or geography, often do.” 135 S. Ct. at 2760 (Breyer, J., dissenting). *354 In other words, “[t]he research strongly suggests that the death penalty is imposed arbitrarily.” 135 S. Ct. at 2762 (Breyer, J., dissenting). Because the “imposition and implementation of the death penalty seems capricious, random, [and] arbitrary,” its imposition on a defendant would seem to be “the equivalent of being struck by lightning.” 135 S. Ct. at 2764 (Breyer, J., dissenting). “How then can we reconcile the death penalty with the demands of a Constitution that first and foremost insists upon a rule of law?” 135 S. Ct. at 2764 (Breyer, J., dissenting).
Reconciling the death penalty with the rule of law under our Kansas Constitution is no less imperative. Like elsewhere, the gatekeeper in this State is the prosecutor, who has unfettered discretion in any capital-eligible case to seek, or to not seek, the death penalty. To state the obvious, unfettered discretion is fertile ground for sprouting arbitrariness. In my view, Kansas is fortunate to have so many competent attorneys who are willing to engage in public service as prosecutors. Nevertheless, those popularly elected public servants cannot be totally immune to the intense public pressure generated by high-profile cases. A system that does not safeguard against such potential arbitrariness cannot withstand constitutional scrutiny.

Cruel—Excessive 'Delays

Ironically, the solutions to the problems of unreliability and unfairness “almost inevitably lead to a third independent constitutional problem: excessively long periods of time that individuals typically spend on death row, alive but under sentence of death.” 135 S. Ct. at 2764 (Breyer, J., dissenting). As of last year, the average length of time between sentencing and execution in the United States was almost 18 years. 135 S. Ct. at 2764 (Breyer, J., dissenting). Kansas has yet to execute anyone since the 1994 adoption of the current capital murder statute, so the average time between sentencing and execution in this State is currently incalculable. Despite this court’s recent efforts to improve the processing of death penalty cases, even when faced with chronic underfunding of the Judicial Branch budget, nothing suggests that Kansas will beat the national average on death penalty delays in the foreseeable future.
The “lengthy delays create two special constitutional difficul *355 ties.” 135 S. Ct. at 2765 (Breyer, J., dissenting). The first is the fact that a lengthy delay “ ‘subjects death row inmates to decades of especially severe, dehumanizing conditions of confinement.’” 135 S. Ct. at 2765 (Breyer, J., dissenting). “Indeed, one death row inmate, who was later exonerated, still said he would have preferred to die rather than to spend years on death row pursuing his exoneration.” 135 S. Ct. at 2766 (Breyer, J., dissenting). In Robinson’s case, it has been 13 years since he was sentenced to death, and he is still pursuing his direct appeal. After the direct appeal is finally resolved, Robinson has the right to pursue collateral relief in both State and federal courts, which could take years, if not decades. Robinson is now 72 years old, making it highly probable that Kansas will face the prospect of executing an octogenarian. See Rapaport, A Modest Proposal: The Aged of Death Row Should Be Deemed Too Old To Execute, 77 Brook L. Rev. 1089 (2012).
The second problem is that lengthy delays “undermine the death penalty’s penological rationale, perhaps irreparably so.” 135 S. Ct. at 2767 (Breyer, J., dissenting). The classic rationale for punishment is to secure deterrence, incapacitation, retribution, or rehabilitation. Obviously, there is no rehabilitation of an executed person, albeit death most certainly incapacitates that person. But life in prison without possibility of parole is no less incapacitating. Accordingly, “the death penalty’s penological rationale in fact rests almost exclusively upon a belief in its tendency to deter and upon its ability to satisfy a community’s interest in retribution.” 135 S. Ct. at 2767 (Breyer, J., dissenting).
With respect to deterrence, decades of studies have been unable to establish reliable statistical evidence to prove one way or the other whether capital punishment deters potential killers. But common sense would dictate that, where a person sentenced to death “is two or three times more likely to find his [or her] sentence overturned or commuted than to be executed,” and “has a good chance of dying from natural causes before any execution (or exoneration) can take place,” the deterrent effect of a death penalty statute would be de minimis. 135 S. Ct. at 2768 (Breyer, J., dissenting).
Likewise, while “[Retribution is a valid penological goal,” one *356 has to question “whether a ‘community’s sense of retribution’ can often find vindication in ‘a death that comes,’ if at all, ‘only several decades after the crime was committed.’” 135 S. Ct. at 2769 (Breyer, J., dissenting). Arguably, whatever interest in retribution that might be served by the death penalty can be similarly served by a sentence of life in prison without parole. 135 S. Ct. at 2769 (Breyer, J., dissenting). Moreover, in that event, one would hope that the victim’s family and friends could attain some semblance of closure sooner if they are spared decades of death penalty appeals.
In short, “[t]he upshot is that lengthy delays both aggravate the cruelty of the death penalty and undermine its jurisprudential rationale.” 135 S. Ct. at 2769 (Breyer, J., dissenting). And if the death penalty fails to reach the goals of deterrence or retribution, “ ‘it is nothing more than the purposeless and needless imposition of pain and suffering and hence an unconstitutional punishment.’” 135 S. Ct. at 2769-70 (Breyer, J., dissenting).
Granted, some uninformed, chest-pounding death penalty proponents will demand that the delays between sentencing and execution be shortened, if not eliminated. One ploy would be to seek a time limit on an appellate court’s consideration of a death penalty appeal. But doing so would only increase the already too high incidence of unreliable and arbitrary death penalties and “risk causing procedural harms that also undermine the death penalty’s constitutionality.” 135 S. Ct. at 2770 (Breyer, J., dissenting). Indeed, one offender was exonerated by DNA evidence 30 years after his conviction, so that an abbreviated or cursoiy appellate review would have resulted in the execution of an innocent man. 135 S. Ct. at 2770-71 (Breyer, J., dissenting). In other words, the death penalty presents a Catch-22 dilemma: to avoid unconstitutionality, a death sentence must be thoroughly and completely examined and reexamined, but tire resultant delay renders the punishment unconstitutional. The remedy is to declare the punishment unconstitutional.

Unusual—Decline in Death Penalty Use

The Eighth Amendment proscribes punishments that are cruel and unusual, whereas § 9 of the Kansas Constitution Bill of Rights proscribes punishments that are cruel or unusual. The Glossip dis *357 sent’s Eighth Amendment analysis reviews the recent decline in the number of states that are using the death penalty, as well as the decline in the number of executions in those states still using the punishment. In 2014, only seven states carried out an execution, i.e., 86% of the states did not execute anyone last year. Even in Texas, which perennially leads the nation in executions, the number decreased from 40 in the year 2000, to 10 in the year 2013. Consequently, considering the nation as a whole, “[i]t seems fair to say that it is now unusual to find capital punishment in the United States.” 135 S. Ct. at 2774 (Breyer, J., dissenting).
I would reiterate what I said in State v. Carr, 300 Kan. 1, 327, 331 P.3d 544 (2014) (Johnson, J., concurring in part and dissenting in part), cert. granted in part 135 S. Ct. 1698 (2015), about giving credence to the Kansas founding fathers’ choice to use the disjunctive “or” in § 9 of the Kansas Constitution Bill of Rights. Under a plain reading of our constitution, a punishment would be infirm if it is either “cruel,” or it is “unusual.” Nevertheless, in my view, the death penalty fits both and I would declare it unconstitutional in this state.